**Mazie KELLER, Plaintiff-Appellant,**

v.

**PRINCE GEORGE'S COUNTY; Prince George's County Department of Social Services, Defendants-Appellees,**

**Equal Employment Opportunity Commission, Amicus Curiae.**

**No. 86-3876.**

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1987.

Decided Aug. 26, 1987.

Herbert Vincent McKnight, Jr. (Ashcraft & Gerel, Washington, D.C., on brief), for plaintiff-appellant:

Justine S. Lisser, E.E.O.C. (Johnny J. Butler, Acting General Counsel, Gwendolyn Young Reams, Acting Associate Gen. Counsel, Vella M. Fink, Asst. Gen. Counsel, Washington, D.C., on brief), for amicus curiae E.E.O.C.

Nancy B. Shuger, Mark J. Davis, Asst. Attys. Gen. (Stephen H. Sachs, Atty. Gen. of Baltimore, Md., on brief), for defendants-appellees.

Before WINTER, Chief Judge, WILKINSON, Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, at Baltimore.

HARRISON L. WINTER, Chief Judge:

Plaintiff Mazie Keller, a black woman, sued her employer, the Prince George's County Department of Social Services (the "Department"), and the State of Maryland alleging discrimination on the basis of race in violation of the fourteenth amendment and 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Plaintiff prayed a jury trial of her § 1983 claim. The suit arose from her employer's decision to deny Keller a promotion. The district court awarded summary judgment to defendants on Keller's § 1983 claim on the ground that Title VII provides the exclusive remedy for employment discrimination claims against a state employer. 616 F.Supp. 540 (D.Md. 1985). After a bench trial, the district

court entered judgment for defendants on the Title VII claim, ruling that the plaintiff had failed to prove, by a preponderance of the evidence, that the denial of her promotion was due to racial discrimination. Plaintiff appeals. We reverse the judgment for defendants on the § 1983 claim and remand the case for further proceedings.

## I.

The Department employed the plaintiff in the classification of Case Worker Associate II when, in September of 1983, she applied for the higher salaried position of Case Worker Associate III. Plaintiff claims that she was denied this promotion due to her race. Keller asserted two causes of action in her suit alleging intentional discrimination arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, because she had been discriminated against in violation of the fourteenth amendment. The underlying facts which support these actions are identical. Subsequent to filing her complaint, the plaintiff filed a demand for a jury trial.

In August 1985, the district court granted the defendants' motion for summary judgment on plaintiff's § 1983 claim on the ground that Title VII provides the exclusive remedy for employment discrimination claims by a state employee. After dismissing plaintiff's § 1983 claim, the district court denied her request for a jury because there is no right to a jury trial under Title VII. 616 F.Supp. at 544.

In September 1985, plaintiff sought leave to amend her complaint to allege that the denial of her promotion resulted in emotional distress and entitled her to compensatory damages under § 1983. The district court denied the plaintiff's motion based on its earlier ruling that Title VII offered the exclusive remedy for the alleged discrimination.

In June 1986, a trial was held before the district judge on plaintiff's Title VII claim. The district judge ruled at trial that plaintiff had established a *prima facie* case of racial discrimination by establishing that she was black, that she had applied for an available position for which she was qualified, that she was rejected for this position, and that after her rejection, the position remained open to applicants of the plaintiff's qualifications. *Accord McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court further ruled that defendants met their burden of articulating a legitimate nondiscriminatory reason for the decision to deny plaintiff the promotion by demonstrating that it was given to an applicant who was more qualified for the position than Ms. Keller.

Finally, the district judge ruled that the plaintiff had failed to prove, by a preponderance of the evidence, that her employer's stated reason for denying her the promotion was a pretext for racial discrimination. In making this determination, the district court disregarded the testimony of plaintiff's witnesses that her employer's promotion decision was motivated by racial animus because the court found the testimony of these witnesses not credible. As a result of these findings, the district court entered judgment for the defendants. Plaintiff appeals, but her appeal is limited to review of the summary judgment for defendants in her § 1983 claim.[1]

## II.

Persons seeking monetary damages under § 1983 have a right to a jury trial under the seventh amendment. *Segarra v. McDade,* 706 F.2d 1301, 1304 & n. 6 (4 Cir.1983). Accordingly, the denial of the plaintiff's demand for a jury trial of her § 1983 cause of action violated her seventh amendment right to a jury trial, and the judgment of the district court is void, unless she had no § 1983 cause of action as a

1. In her notice of appeal, plaintiff suggests that the district court's findings of fact in her Title VII cause of action were arbitrary and capricious. The plaintiff, however, failed to address this issue in her brief or to provide us with a transcript of the proceedings below as required by Federal Rule of Appellate Procedure 10(b) and (d). Thus, plaintiff has waived on appeal any contention that the district court's findings of fact were clearly erroneous.

matter of law. *In re N–500L Cases,* 691 F.2d 15, 19 (1 Cir.1982); *Gnossos Music v. Mitken Inc.,* 653 F.2d 117 (4 Cir.1981). The denial of the plaintiff's right to a jury trial is harmless error, however, if the trial judge would have directed a verdict in favor of the defendants. *In re N–500L Cases, supra,* 691 F.2d at 25. The standard of review regarding a directed verdict is whether the evidence is such, without weighing the credibility of the witnesses, that there is only one conclusion that reasonable jurors could have reached. *Wheatley v. Gladden,* 660 F.2d 1024, 1027 (4 Cir.1981).

 The defendants' argument that a directed verdict would be warranted in this case lacks merit. The plaintiff offered substantial evidence on the issue of whether her employer's decision to deny her the promotion was a pretext for racial discrimination which the district court weighed and decided was insufficiently credible to warrant a verdict of intentional discrimination. The district court did not conclude that the defendants' evidence was so convincing that it merited a directed verdict. Critically, the district court also disregarded direct evidence that the defendants were motivated by racial animus because the court found that the statements of plaintiff's witnesses were not credible. If this credibility finding had not been made, the evidence would have demonstrated that the plaintiff's supervisor denied the plaintiff the promotion due to racial animus because, according to plaintiff's witnesses, the supervisor had stated that the plaintiff was "so black that I can hardly stand to look at her." While we see no indication that the district judge's findings were clearly erroneous, they do not establish that the defendants were entitled to a directed verdict so as to deprive plaintiff of her right to a jury trial if she was entitled to one. Thus we are brought to the basic question of the correctness of the district court's ruling

that plaintiff's § 1983 cause of action was superseded by the enactment of Title VII.

### III.

In 1972, Congress adopted the Equal Employment Opportunity Act (the Act), § 2 of which extended the coverage of Title VII of the Civil Rights Act of 1964 to allow suits against state and local government employers under the same conditions as private employers. P.L. No. 92–261, 86 Stat. 103 (1972). At the time this Act was adopted, § 1 of the Civil Rights Act of 1871 already provided a federal cause of action against any person who, acting under color of state law, deprived another person of any federal constitutional or statutory right. 42 U.S.C. § 1983. These two statutory provisions differ in several respects. Title VII claimants must follow a detailed administrative process which persons seeking relief under § 1983 may avoid. 42 U.S.C. § 2000e–5; 29 C.F.R. § 1613. A Title VII claimant must also exhaust her state and federal administrative remedies before being allowed to proceed to federal court; § 1983 has no similar exhaustion requirement. *Id.* In addition, the limitation period for a § 1983 claim is also generally longer than the 180–day limitation period for a Title VII claim.[2]

Title VII and § 1983 also differ in the relief which they offer to aggrieved parties. Section 1983 provides for equitable and legal relief, including awards of compensatory or punitive damages, while Title VII grants authority only for equitable relief. Monetary relief available to a Title VII claimant is typically limited to an award of back pay. While a jury trial is available for a plaintiff's legal claim under § 1983, Title VII's limitation to equitable relief means that there is no right to a jury trial in Title VII actions. *Lehman v. Nakshian,* 453 U.S. 156, 164, 101 S.Ct. 2698, 2703, 69 L.Ed.2d 548 (1981). A jury trial is similarly unavailable in a § 1983 action if

---

**2.** Section 1983 does not contain a limitation period, and thus an appropriate limitation period must be borrowed from an analogous state law cause of action. The Supreme Court recently decided that, for statute of limitation purposes, all § 1983 actions would be characterized

as tort actions for the recovery of damages for personal injuries. *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The statute of limitation for such tort actions is generally several years. ·

only equitable relief is sought. *See infra,* part III B.

## A.

◼ Relying on *Great American Federal Savings & Loan Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) and *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the district court held in this case that Title VII provides the exclusive remedy for a plaintiff seeking relief for intentional discrimination in employment decisions by a state government. 616 F.Supp. 543–44.[3] The district court reasoned that allowing the plaintiff to proceed under § 1983 would circumvent the detailed procedures and remedies that Congress created for Title VII. *Id.* Moreover, the district court ruled that § 1983 as invoked by plaintiff, unlike § 1981 which is not preempted by Title VII, creates only a remedy and no substantive right against employer discrimination, conduct which is exclusively redressed by Title VII. *Id.* We conclude that this holding conflicts with the intent of Congress in adopting the 1972 amendments to Title VII and established case law on this subject.

The Supreme Court first considered the interplay between Title VII and the Civil Rights Acts in *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). The unanimous Court in *Johnson* held that Title VII does not preempt an employment discrimination suit against a private employer brought under 42 U.S.C. § 1981 of the Civil Rights Act of 1866, which prohibits racial discrimination in contractual relations. The Court found that the intention of the 1964 Act was expressed in the House and Senate Reports and the floor debates which accompanied the passage of the 1972 amendments to Title VII. *Id.,* 421 U.S. at 461, 95 S.Ct. at 1720–21. Despite Title VII's comprehensive framework, the Court concluded

from the legislative history of Title VII that Congress intended to allow individuals independently to pursue their rights under Title VII and other applicable federal statutes. *Id.* The Court acknowledged that the procedures for relief under § 1981 and Title VII were at odds with each other and that the filing of a § 1981 suit would weaken the administrative process mandated by Title VII. But, the Court reasoned, these difficulties were the byproduct of Congress' choice to make available multiple remedies against employment discrimination.

In *Brown,* the Supreme Court held that, unlike a private employee, a federal employee may not maintain a § 1981 suit against the United States based on a claim of intentional discrimination in employment. 425 U.S. at 835, 96 S.Ct. at 1969. The Court ascertained Congressional intent from several sources. First, the Court found that the legislative history of § 717 of Title VII, which protects federal employees against intentional discrimination, revealed that Congress believed that, prior to this legislation, federal employees had no judicial remedy for intentional acts of employment discrimination. *Id.,* 425 U.S. at 828, 96 S.Ct. at 1965–66. The Court inferred from this that Congress' intent in passing § 717 was to create an exclusive judicial scheme for remedying employment discrimination. *Id.* The Court also found that the comprehensive remedial framework provided to federal employees under Title VII was inconsistent with the view that § 717 was designed to supplement other judicial remedies. *Id.,* 425 U.S. at 832, 96 S.Ct. at 1967. While the Court acknowledged the tension between this holding and the decision in *Johnson,* it distinguished the latter case on the ground that *Johnson's* holding "rested upon the explicit legislative history of the 1964 Act." *Id.,* 425 U.S. at 833–34, 96 S.Ct. at 1968.

---

**3.** This case does not raise the issue of whether Title VII provides the exclusive remedy when a cause of action under § 1983 is based on a violation of a federal statute, such as Title VII itself, instead of the fourteenth amendment. *Cf. Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (a comprehen-

sive enforcement scheme preempts § 1983's remedy for a violation of a federal statutory right). This case also does not raise the issue of whether § 1983 is available to a plaintiff for the discriminatory employment decisions of a state government which violate the fourteenth amendment but which do not fall within the coverage of Title VII.

Most recently, in *Novotny*, the Supreme Court held that § 1985(3), which provides redress for conspiracies to deprive persons of their federal rights, was unavailable to a private employee as a remedy against intentional acts of employment discrimination. 442 U.S. at 378, 99 S.Ct. at 2352. Relying primarily on *Brown*, the Court prohibited plaintiffs from bringing employment discrimination suits under § 1985(3) because that would allow plaintiffs to bypass the administrative and remedial framework established by Title VII. *Id.* Moreover, unlike § 1981, § 1985(3) offered only a remedy to protect federal rights and did not create any substantive rights. 442 U.S. at 376, 99 S.Ct. at 2351. The Court distinguished *Johnson* on this basis, and on the ground that Congress had clearly expressed its view that § 1981 was not impliedly repealed by the 1964 Act. 442 U.S. at 377 & n. 21, 99 S.Ct. at 2351 & n. 21.

The issue presented in this case is whether Congress intended in adopting § 2 of the Equal Employment Opportunity Act of 1972 to make Title VII the exclusive remedy for public sector employment discrimination in violation of constitutional safeguards. Title VII is silent on this question. As the Court in *Johnson* and the cases which have interpreted *Johnson* suggest, we must look to the legislative history to determine if Congress intended for Title VII to preempt § 1983. The district court

in its opinion, however, failed to consider the legislative history of the 1972 amendments to Title VII. *Johnson*, however, requires that Congress' intentions must be consulted to resolve the issue of whether Title VII preempts a preexisting cause of action.[4]

Relying on its comprehensive scheme to infer that Title VII impliedly repealed earlier civil rights statutes is problematic because such an implied repeal ignores the nature of the social malady which Title VII was intended to help eradicate. *Cf.* Easterbrook, The Court and the Economic System, 98 Harv.L.Rev. 14–15 (1984) (a remedial approach to legislative interpretation is appropriate where a law is designed to overcome market failures). A remedial focus on the problem of employment discrimination reveals that a battery of remedies is required to combat entrenched discrimination. Indeed, Congress recognized in adopting Title VII that no single approach to the problem of employment discrimination could be a panacea. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47–49, 94 S.Ct. 1011, 1019–20, 39 L.Ed.2d 147 (1974).[5] We would expect, therefore, that if Congress intended to change the scope of Title VII in its 1972 amendments to the Act, it would have clearly expressed this intention in such amendments. As the Court concluded in *Johnson*, 421 U.S. at 461, 95 S.Ct. at 1720–21:

**4.** *Accord Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984) ("We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial equal protection claim. Since 1871, when it was passed by Congress, § 1983 has stood as an independent safeguard against deprivations of federal constitutional and statutory rights ... Nevertheless, § 1983 is a statutory remedy and Congress retains the authority to repeal it or replace it with an alternative remedy. The crucial consideration is what Congress intended") (citations omitted).

**5.** In *Alexander v. Gardner-Denver Co., supra,* the Court held that an employee's statutory right under Title VII to a trial de novo on his claim of discriminatory discharge was not foreclosed by prior submission of his claim to arbitration under a nondiscrimination clause of a collective bargaining agreement. In reaching this conclusion, the Court explained:

[L]egislative enactments in this area have long evinced a general intent to accord paral-

lel or overlapping remedies against discrimination. In the Civil Rights Act of 1964, Congress indicated that it considered the policy against discrimination to be of the "highest priority." Consistent with this view, Title VII provides for consideration of employment-discrimination claims in several forums. See 42 U.S.C. § 2000e–5(b) (EEOC); 42 U.S.C. § 2000e–5(c) (state and local agencies); 42 U.S.C. § 2000e–5(f) (federal courts). And, in general, submission of a claim to one forum does not preclude a later submission to another. See 42 U.S.C. § 2000e–5(b) and (f). Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.

*Id.* at 47–49, 94 S.Ct. at 1019–20 (citations omitted).

We are disinclined, in the face of congressional emphasis upon the existence and independence of the two remedies, to infer any positive preference for one over the other, without a more definite expression in the legislation Congress has enacted.

### B.

The legislative history of the 1972 amendments to Title VII obviates the need to search for Congress' implied intentions; that history clearly indicates that § 2 of the Act was not intended to preempt the preexisting remedy under § 1983 for violations of the fourteenth amendment by state employers. The legislative history of the 1972 amendments is of such clarity on this issue, that the Court in *Johnson* relied on the record of the 1972 amendments to divine Congress' intent eight years earlier in passing the Civil Rights Act of 1964. *Supra*, 421 U.S. at 459, 95 S.Ct. at 1719-20. The Court in *Brown* and *Novotny* expressly reaffirmed the holding in *Johnson* and interpreted *Johnson* as being based on the explicit legislative history on this issue. As we read the same legislative history of the 1972 amendments which the *Johnson* Court relied on to interpret the 1964 Act, we are led to conclude that Title VII was not intended to displace a state employee's remedy under § 1983. Any other conclusion would require us to ignore both the Supreme Court's holding in *Johnson* and to substitute judicial policy for the course established by Congress in 1972. We now turn to that history.

When the Congress in 1971 was considering revisions of the Civil Rights Act of 1964, the House Committee on Education and Labor reported proposed amendments to Title VII to eliminate the exemption for state and local employers. H.R. 1746, Legislative History of the Equal Employment Opportunity Act of 1972, 1–60, 92d Cong.,

2d Sess. (Comm. Print 1972) (hereinafter "Legislative History"). The Committee Report accompanying the bill explained its intended effect:

> In establishing the applicability of Title VII to State and local employees, the Committee wishes to emphasize that the individual's right to file a civil action in his own behalf, pursuant to the Civil Rights Act of 1870 and 1871, 42 U.S.C. §§ 1981 and 1983, is in no way affected.... The bill, therefore, by extending jurisdiction to State and local government employees does not affect existing rights that such individuals have already been granted by previous legislation.

H.R.Rep. No. 92-238, Legislative History, at 78–79.[6]

When the bill reached the House floor, Congress was informed of the bill's intention. Congressman Erlenborn responded by introducing a bill which, among other things, amended the Committee's proposal to make Title VII "the exclusive remedy of any person claiming to be aggrieved by an unlawful employment practice." H.R. 9247, Legislative History, at 141, 144. One express purpose of this provision was to foreclose a plaintiff's recourse to the existing remedies afforded by the Civil Rights Acts of 1866 and 1871. Legislative History, at 231 (statement of Cong. Erlenborn); Legislative History, at 264 (statement of Cong. O'Hara). Members of the House expressed opposition to the Erlenborn amendment because it was intended to nullify the protections of the Civil Rights Acts which enforce individual rights guaranteed under the fourteenth amendment. Legislative History, at 249 and 242 (statement of Cong. Eckhardt); Legislative History, at 264 (statement of Cong. Hawkins, sponsor of the original house bill); Legislative History, at 276 (statement of Cong. Abzug). Congressman Hawkins, sponsor of the original house bill, objected that "the Er-

---

**6.** *See also Id.*, Legislative History, at 79 ("Inclusion of state and local employees among those enjoying the protection of Title VII provides an alternative administrative remedy to the existing prohibition against discrimination perpetuated 'under color of state law' as embodied in the Civil Rights Act of 1871, 42 U.S.C. § 1983"). The minority views on H.R. 1746 from the Committee included the objection that the bill failed to make Title VII an exclusive federal remedy. H.Rep. 92–238, Legislative History, at 126. The minority specifically noted that their attempts to amend the Committee bill to make Title VII an exclusive remedy had been unsuccessful. The opponents in the committee argued that this omission would undercut the statutory role of the EEOC and other Title VII procedures. Legislative History, at 126–27, 129.

lenborn substitute ... nullif[ies] the Civil Rights Act of 1866, which later became the 14th Amendment ... and it wipes out other Civil Rights Acts as well." *Id.* at 285. Despite these and other objections, however, the House approved the Erlenborn amendment in the form of a substitute for the Committee bill, and included the provision making Title VII the exclusive remedy for discriminatory employment practices. Legislative History, at 314, 326, 329.

After the bill was referred to the Senate, the Senate Committee on Labor and Public Welfare held hearings on the House proposal. During those hearings, a representative of the Department of Justice criticized the exclusivity provision of the House bill, arguing that existing remedies had achieved considerable success in the battle against discrimination and that they should not be eliminated.[7] Based on this testimony, the Senate committee reported a substitute bill which, by omitting the exclusivity provision of the House bill, preserved these historic remedies against racial discrimination. Legislative History, at 603. The Senate Report accompanying the proposed bill echoed the original language of the House Committee Report:

> [N]either of the above provisions regarding the individual's right to sue under title VII, nor any of the other provisions of this bill, are meant to affect existing rights granted under other laws.

S.Rep. No. 92–415, Legislative History, at 433.

After the Committee bill was reported to the floor of the Senate, opponents of the bill proposed amendments to make Title VII the exclusive remedy for employment discrimination. Legislative History, at

1092, 1095 (Proposed by Sen. Ervin); Legislative History, at 1382 (Proposed by Sen. Hruska). These amendments were intended to bar the preexisting remedy for intentional employment discrimination which Congress knew to exist under § 1983. The sponsor of one of the amendments, Senator Hruska stated:

> [C]ourt decisions ... have held that Title VII has not preempted the field of civil rights in employment and thus an individual has an independent cause of action in cases of employment discrimination pursuant to the provisions of the Civil Rights Act of 1866 (42 U.S.C. 1981) and 1871 (42 U.S.C. Section 1983) and that actions may be brought under all three laws simultaneously.

Legislative History, at 1507. Thus, Congress was fully aware during this debate that employees had multiple remedies available to counter employment discrimination, including § 1983. Report of the U.S. Commission on Civil Rights,[8] Legislative History, at 1123. Senator Javits, the ranking minority member of the Senate Labor Committee and a major proponent of the 1972 Act, explained:

> There are other remedies, but those other remedies are not surplusage. Those other remedies are needed to implement the promise we made under the Constitution to prevent discrimination in employment. The laws of 1866, 1871, as well as the law of 1964 are to implement that promise.

Legislative History, at 1512.[9]

Proponents of exclusivity argued that allowing multiple remedies would encourage duplicative and burdensome litigation and circumvent the administrative scheme of

---

**7.** The representative from the Department of Justice testified during those hearings:

> In sum, although we favor the granting of judicial enforcement authority to EEOC, we are concerned that at this point in time there be no elimination of any of the remedies which have achieved some success in the effort to end employment discrimination. In the field of civil rights, the Congress has regularly insured that there be a variety of enforcement devices to insure that all available resources are brought to bear on problems of discrimination.

Legislative History, at 1399.

**8.** The Report of the U.S. Commission on Civil Rights on Equal Employment Opportunity in State and Local Government helped spark Congress to take action against employment discrimination by state employers and was influential in the debates on the merits of such action. *E.g.,* Legislative History, at 1113–14 (Statement of Sen. Williams).

**9.** *See also,* Legislative History, at 1174 (statement of Sen. Javits) (federal courts currently have authority to remedy employment discrimination by state employers in violation of the fourteenth amendment); Legislative History, at 1403, 1517 (statement of Sen Williams) ("The

the EEOC. Legislative History, at 1379–81, 1396–97, 1508–10 (statements of Sen. Hruska). Despite these objections, however, the Senate rejected the proposed amendments to make Title VII an exclusive remedy on three occasions. Legislative History, at 1407, 1521, 1790. Congress instead reaffirmed the federal policy favoring a system of overlapping, and sometimes redundant, remedies to combat the entrenched malady of racial discrimination. Senator Javits quoted the testimony of the Department of Justice on this issue:

> At this juncture, when we are all agreed that some improvement in the enforcement of Title VII is needed, it would be, in our judgment, unwise to diminish in any way the variety of enforcement means available to deal with discrimination in employment. The problem is widespread and we suggest that all available resources should be used in the effort to correct it.

Legislative History, at 1400. *See also* Legislative History, at 1512–13.[10]

Congress realized that extending Title VII to cover state employees might not further the cause of ending racial discrimination if its action simultaneously restricted the existing remedies available to state employees. Congressman O'Hara argued that if Title VII were to preempt existing remedies, employees "would be better off with nothing than with the Erlenborn substitute." Legislative History, at 264. Senator Williams echoed this sentiment in the Senate:

> [T]he courts have specifically held that Title VII and the Civil Rights Acts of 1866 and 1871 are not mutually exclusive, and must be read together to provide alternative means to redress individual grievances ... to make Title VII the exclusive remedy for employment discrimination would be inconsistent with our entire legislative history of the Civil Rights Act. It would jeopardize the degree and scope of remedies available to the workers of our country. To lock the aggrieved person into the administrative remedy would narrow rather than strengthen our civil rights enforcement effort.

Legislative History, at 1403–04.[11] The proponents of the Act accordingly emphasized that they did not intend to preempt preexisting rights or remedies which were available under other Civil Rights Statutes. Senator Javits stated on the Senate floor:

> At a time when we are trying to increase the enforcement power in regard to discrimination in employment, it is certainly not the time in which to dismantle a very important series of remedies—and again I use that word—which would be dismantled were this [Hruska] amendment to be adopted.

Legislative History, at 1515.

Congress also believed that the fears of opponents of the 1972 Act that multiple remedies would undercut the comprehensive scheme of Title VII were exaggerated. Congress understood that the courts had for some time allowed multiple remedies in employment discrimination suits and that there was considerable judicial experience in reconciling the various overlapping statutory schemes.[12] In addition, Congress

---

law against employment discrimination did not begin with Title VII and the EEOC, nor is it intended to end with it. The right of individuals to bring suits in Federal courts to redress individual acts of discrimination, including employment discrimination was first provided by the Civil Rights Acts of 1866 and 1871, 42 U.S.C. sections 1981, 1983").

**10.** The sponsor of the Senate Bill, Senator Williams, was also emphatic on this point: "[The Civil Rights Act of 1866] was followed up, in 1871, by another provision. These are basic laws from which, as the Attorney General stated, developed a body of law that should be preserved and not wiped out, and all available resources should be used to correct discrimina-

tion in employment." Legislative History, at 1517.

**11.** *See also* Legislative History, at 1403 (statement of Senator Williams) ("[T]he amendment of the Senator from Nebraska will repeal the first major piece of civil rights legislation in this Nation's history. We cannot do that"); Legislative History, at 1514 (statement of Sen. Javits) (making Title VII an exclusive remedy would "take perhaps two steps forward, and then one step backward").

**12.** Defendants suggest that district courts will be overly burdened by difficulties in managing litigation in which Title VII and § 1983 claims have been joined. These fears are illusory. The

emphasized its commitment to overlapping remedies in Title VII by adopting § 706, which allowed the EEOC to bring civil actions and to intervene in Title VII suits in federal court. This authority supplemented overlapping procedures already contained in Title VII for consultation with the EEOC and state and local agencies, and for bringing a private cause of action in federal court. *See* 42 U.S.C. § 2000e–5; *supra* note 5. Proponents of the 1972 amendments also noted that the judicial tool of collateral estoppel would be available to administer efficiently multiple litigation over claims of employment discrimination authorized by different federal statutes. Legislative History, at 1400–01 (statement of Sen. Javits).

Congress acknowledged the possibility that, in some cases, plaintiffs might escape the narrow limitations period of Title VII by bringing an action under the Civil Rights Acts. *Id.* But this difficulty was not considered serious because plaintiffs would still have an incentive to employ the remedial scheme of Title VII in order to secure the support of the United States Attorney General, as authorized by the Act.[13]

The House and Senate bills were finally sent for a conference between the two houses, in which the House receded from its provision making Title VII an exclusive remedy for unlawful employment practices. Conference Report, Legislative History, at 1815. The final bill passed by Congress thus preserved § 1983 as an alternative remedy for state employees subjected to employment discrimination in violation of the fourteenth amendment.[14]

---

district courts for some time have undertaken the task of accommodating § 1981 and Title VII suits within similar litigation. Indeed, the district courts have gained direct experience regarding these issues from having to accommodate § 1983 and Title VII suits because the contention that Title VII preempts § 1983 is a relatively new one. We also point out that the defendants' argument is inconsistent with its position that Title VII preempts other statutory remedies such as § 1985 and § 1983, relying on *Novotny,* but that it may not preempt statutory rights such as § 1981. The difficulties of accommodating the statutory scheme of § 1981 with Title VII are, of course, identical to those posed by joining § 1983 and Title VII claims.

The district courts may thus draw upon a considerable experience in civil rights litigation to deal with the difficulties which Congress accepted as the price of an all-out assault on employment discrimination. For example, much case law has already developed to reconcile the divergent limitation periods and exhaustion requirements of Title VII and § 1981 in employment discrimination suits against private employers. *See Johnson, supra;* Developments in the Law—Section 1981, 15 Harv.C.R.C.L.L. Rev. 239–246 (1980). In addition, the right to a jury trial under § 1983 presents no more difficulty to a district court than is encountered in any action in which legal and equitable claims have been joined. Finally, although the damages available to a plaintiff are more generous in an action under § 1983, it is commonplace for damage remedies to differ among the different causes of action which are available to a plaintiff. It should also be noted that, as practical matter, retroactive relief will be barred in many cases by the eleventh amendment. *See Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

**13.** Title VII limits the EEOC role in claims against state employers to mediation and conciliation. 42 U.S.C. § 2000e–5(f)(1). At the heart of the 1972 amendments, granting the EEOC new enforcement powers against employers, was Congressional recognition that such measures were usually futile without enforcement powers to support them. Legislative History, at 74. The key provision of Title VII, as far as Congress and state employees were concerned, was the provision allowing the Attorney General of the United States to bring an action seeking preliminary relief against a state government or agency. 42 U.S.C. § 2000e–5(f)(2). This authority is discretionary with the Attorney General. If the Attorney General declines to act, the administrative scheme established by Title VII is toothless. Thus, Congress contemplated that the possibility of action by the Attorney General would serve as a carrot to attract litigants to employ Title VII's remedial scheme. Legislative History, at 898, 1116 (statement of Sen. Williams); Legislative History, at 673 (statement of Sen. Humphrey). Given the risk that the Attorney General might decline to take such action, Congress correctly feared that making Title VII the exclusive remedy in employment discrimination actions would undercut the assault on employment discrimination. *See* Legislative History, at 1514 (statement of Sen. Javits) ("Many ... people feel the bill is not worthwhile no matter what is left in it if it has in it destruction of what is law today").

**14.** *See generally,* Shapiro, Section 1983 Claims to Redress Discrimination in Public Employment: Are They Preempted by Title VII?, 35 Am.U.L.Rev. 93 (1985); Sape & Hart, Title VII Reconsidered: The Equal Employment Opportunity Act of 1972, 40 Geo.Wash.L.Rev. 824, 845, 849 (1972).

We reach an obvious conclusion from this legislative history: Congress explicitly expressed its intent in passing the 1972 Act, an intent which the Supreme Court in *Johnson, Brown,* and *Novotny* characterized as binding on the question of Title VII's exclusivity. Unlike actions against federal employers discussed in *Brown,* Congress was aware of the remedies for state employees such as § 1983 which preexisted Title VII, and it decided that those remedies should remain available. The Court's decision in *Novotny* does not undermine this conclusion because Congress omitted discussion of the remedy afforded by § 1985(3) in enacting Title VII in 1964 while, in contrast, Congress stated that it did not intend in enacting the 1972 Act to preempt either the preexisting rights or remedies of state employees, including those remedies provided by § 1983. Legislative History, at 1512 (statement of Sen. Javits) (Title VII amendments preserve the preexisting remedies and rights created by the Civil Rights Acts of 1866 and 1871).

The district court's interpretation of the recent decisions in *Brown* and *Novotny* was thus erroneous. To conclude that Title VII preempts an action under § 1983 for a violation of the fourteenth amendment, we would be required to substitute our own notions of federal policy for those of Congress. The final result would vitiate the intent of § 2 of the 1972 Act to adopt an aggressive pro-civil rights measure. We decline to adopt as law the view of a minority of Congress when the majority will is so well documented.[15]

## C.

Available case law on the issue before us supports our conclusion. The Courts of Appeals which have addressed this issue have concluded that Title VII does not preempt an action under § 1983 which is based on an alleged violation of the fourteenth amendment. *Ratliff v. City of Milwaukee,* 795 F.2d 612, 623–24 (7 Cir.1986); *Alexander v. Chicago Park District,* 773 F.2d 850 (7 Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986); *Trigg v. Fort Wayne Community Schools,* 766 F.2d 299 (7 Cir.1985); *Day v. Wayne County Board of Auditors,* 749 F.2d 1199 (6 Cir.1984); *Carpenter v. Stephen F. Austin State University,* 706 F.2d 608, 612 n. 1 (5 Cir.1983); *Grano v. Department of Development, City of Columbus,* 637 F.2d 1073 (6 Cir.1980); *Vulcan Society of N.Y. City Fire Department v. Civil Service Commission,* 490 F.2d 387, 390 n. 1 (2 Cir.1973).[16] We have previously entertained appeals from actions brought simultaneously under Title VII and § 1983, without comment on the possibility of preemption. *See Gairola v. Virginia Dep't of General Services,* 753 F.2d 1281, 1283 (4 Cir.1985).[17]

While the Supreme Court has not specifically addressed the question, it too has acted in several cases under the assumption that Title VII does not preempt an

---

**15.** *See, generally,* Easterbrook, *supra,* at 14–19, 54–60; Posner, Economics, Politics, and the Reading of Statutes and the Constitution, 49 U.Chic.L.Rev. 263 (1982).

**16.** Most district courts have also rejected the claim that Title VII preempts an action for intentional discrimination under § 1983. *See Snell v. Suffolk County,* 611 F.Supp. 521, 523 (E.D.N.Y.1985); *Green v. Illinois Dep't of Transp.,* 609 F.Supp. 1021, 1027 (N.D.Ill.1985); *Meyett v. Coleman,* 613 F.Supp. 39 (W.D.Wis. 1985); *Storey v. Board of Regents,* 600 F.Supp. 838, 840 (W.D.Wis.1985); *Zewde v. Elgin Community College,* 601 F.Supp. 1237, 1246 (N.D.Ill. 1984); *Daisernia v. New York,* 582 F.Supp. 792, 797 (N.D.N.Y.1984); *Skadegaard v. Farrell,* 578 F.Supp. 1209, 1218 (D.N.J.1984); *Hall v. Board of County Comm'rs of Frederick County,* 509 F.Supp. 841, 848 (D.Md.1981). The district

courts of our circuit are, however, divided on this issue. *Compare Weide v. Mass Transit Administration,* 628 F.Supp. 247, 250–51 (D.Md. 1985), *with, Baruah v. Young,* 536 F.Supp. 356, 363 (D.Md.1982).

**17.** Several cases, while not specifically addressing whether Title VII is an exclusive remedy, impliedly adopt the majority position. In all of them, § 1983 claims, based on rights independent of Title VII, were brought along with Title VII claims in the same action. *See Lowe v. City of Monrovia,* 775 F.2d 998, 1010–11 (9 Cir.1985), *as amended,* 784 F.2d 1409 (1986); *Nilsen v. City of Moss Point,* 701 F.2d 556 (5 Cir.1983); *Poolaw v. City of Anadarko,* 660 F.2d 459 (10 Cir.1981), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 779 (1985); *Whiting v. Jackson State Univ.,* 616 F.2d 116 (5 Cir.1980).

action under § 1983. *See Local 93, Fire-fighters v. City of Cleveland,* — U.S. —, 106 S.Ct. 3063, 3066, 3073 n. 8, 92 L.Ed.2d 405 (1986); *Patsy v. Florida Board of Regents,* 457 U.S. 496, 500–01, 102 S.Ct. 2557, 2559–60, 73 L.Ed.2d 172 (1982). In cases where the issue was not squarely presented, the Court has nonetheless explicitly stated its view that Title VII does not preempt an action under § 1983 for intentional employment discrimination.[18]

The Supreme Court's recent affirmative action decisions also indicate that the Court rejects the view that Title VII may preempt a cause of action for intentional employment discrimination under § 1983. The standards for review of affirmative action plans, for both public and private employers, are more liberal under Title VII than are the standards imposed on public employers by the fourteenth amendment in a § 1983 suit. *Compare Johnson v. Transportation Agency,* — U.S. —, —, 107 S.Ct. 1442, 1449–50, 94 L.Ed.2d 615 (1987) (affirmative action plans are valid under Title VII if they are designed to eliminate manifest imbalances in traditionally segregated job categories), *with U.S. v. Paradise,* — U.S. —, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (affirmative action plans are subject to strict scrutiny under the fourteenth amendment, and must therefore be narrowly tailored to serve a compelling government interest). The stricter standards that the Court has imposed under the fourteenth amendment would be, of course, functionally irrelevant if aggrieved public employees may only challenge an affirmative action plan adopted by a state employer under the rubric of Title VII. Given the Court's recent pronouncements on the independent rights and remedies protected by Title VII and § 1983, we think it difficult to imagine that the Supreme Court would uphold a ruling that Title VII in fact

preempts the remedy available for a violation of the fourteenth amendment for intentional employment discrimination provided by § 1983.

## IV.

On appeal, defendants raise for the first time the defense that retroactive relief under § 1983 is barred by the eleventh amendment. To accept this defense would limit the plaintiff's remedies to equitable relief under § 1983, relief to which the district judge has already ruled that the plaintiff is not entitled and for which no right to a jury trial is available.

■ The defense of sovereign immunity, grounded in the eleventh amendment, is sufficiently analogous to a jurisdictional bar that it may generally be raised at any stage of the proceedings. *Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974); *Faust v. South Carolina State Highway Dept.,* 721 F.2d 934, 940 (4 Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). We are reluctant, however, to address this issue for the first time on appeal where, as here, it involves a difficult question of state law and factual proof that was not developed in the district court. An unconsenting state enjoys eleventh amendment protection against a § 1983 suit for damages. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan, supra.* On the other hand, a municipality or other local government unit does not enjoy the protection of the eleventh amendment and may be sued under § 1983 for constitutional deprivations. *Lake County Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Monell v. Department of Social Services,* 436 U.S. 658,

---

**18.** *See Novotny, supra,* 442 U.S. at 377 n. 21, 99 S.Ct. at 2351 n. 21 ("the Civil Rights Acts of 1866 and 1871 were explicitly discussed during the course of the legislative debates [of the 1972 Act] ... and the view was consistently expressed that the earlier statutes would not be implicitly repealed"); *Id.* at 395 n. 19, 99 S.Ct. at 2361 n. 19 (White, J., dissenting) ("The majority recognizes that Congress has explicitly noted that

Title VII does not pre-empt redress of grievances under 42 U.S.C. § 1981 and 42 U.S.C. § 1983"); *Alexander v. Gardner-Denver Co. supra,* 415 U.S. at 47–48 n. 7 & 9, 94 S.Ct. at 1019–20 n. 7 & 9 (noting Congress' intent to create parallel remedies against employment discrimination, including § 1983 and § 2 of the 1972 Act).

98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Application of the eleventh amendment in this case thus depends on whether the Prince George's County Department of Social Services is an arm of the State.[19]

■ No record has been developed on this question. Because "[t]he District Court is in the best position to address in the first instance the competing questions of fact and state law necessary to resolve the eleventh amendment issue," *Patsy v. Florida Board of Regents, supra,* 497 U.S. at 515 n. 19, 102 S.Ct. at 2567–68 n. 19, we remand for that purpose. Indeed, the district court may be able to resolve some of the eleventh amendment difficulties in this case by permitting amendments to the pleadings.[20]

Several factors are relevant in analyzing the nature of the Department for purposes of the eleventh amendment: the characterization of the Department under state law; the extent of state control over the Department; the extent to which it depends on state appropriations; and whether a damage award would come from state funds. *Mount Healthy, supra.* Factors of particular importance in this case include whether the money appropriated to the Department comes primarily from state funds, and whether the local Department raises its own monies. If the Department obtains

a significant amount of local appropriations, a judgment against it may not effect state coffers. The Maryland Code authorizes payment of administrative costs of the local Department out of "funds derived from local sources" or state allotments. Md.Code Art. 88A § 13(d). The Code authorizes "[t]he local governing authority in each county ... to levy for or appropriate such funds, from time to time, as may be necessary for this purpose."[21] *Id.* The Code also requires that local departments be represented by their own counsel in all civil cases. Art. 88A § 7. Fees for such services are paid from the regular administrative funds of the local department. Art. 88A § 13(c). There is no record of how this authority is used in practice. We do not know the extent to which local monies have been appropriated by the Department or whether a judgment against the Department would have any effect on state coffers. These issues of fact, and state law, should be decided by the district court in the first instance. On remand, if the state chooses to raise the defense of the eleventh amendment, the district court may consider its proper application in this case.

REVERSED AND REMANDED.

WILKINSON, Circuit Judge, concurring;

The only question here is what Congress intended. The comprehensive nature of Ti-

---

**19.** The eleventh amendment defense also raises another issue. The eleventh amendment does not bar an award of back pay in a suit under Title VII against state officials. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). In the context of a suit under § 1983, a claim for back pay may be considered legal in nature and would thus entitle the plaintiff to a jury trial of her claims of intentional discrimination under § 1983. *See Setser v. Novack Investment Co.,* 638 F.2d 1137, 1139–43 (8 Cir.1981) (remedy of back pay under § 1981 is legal and entitles plaintiff to a jury trial of all issues), *amended in banc,* 657 F.2d 962 (1981), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981). We also decline to resolve this issue before the district court has been given the opportunity to do so.

**20.** For example, the state argues that the plaintiff's Title VII claim for back pay is barred by the eleventh amendment because the plaintiff has named no individual defendants. Such action has been unnecessary until this point because the state allowed the Title VII claim to be

fully tried without raising the defense of sovereign immunity.

**21.** The extent of local monies appropriated for administrative costs of the Department may be important in this case because the state may exercise less control over personnel decisions, such as Ms. Keller's promotion, than over policy decisions made by the Department. Art. 88A § 13 requires the State Department of Social Services to "create or continue in each county" a local department of Social Services. With regard to policies governing the provision of Social Services, the discretion of the Department is limited. Art. 88A § 3(a)(2). With regards to administration of these programs and activities, however, the local department is subject only to the broad guidance of the state. Art 88A § 13(c)(2), (3). In exercising this authority, the local director has only "a general administrative responsibility to the State administration." Art. 88A § 13(c).

tle VII and the obvious differences between Title VII and § 1983 suggest at first blush that Title VII is the exclusive remedy for claims of employment discrimination against state and local governments. These facts are, however, only clues in the search for congressional intent. Here the legislative history of the 1972 Amendments leaves no doubt that Congress intended to preserve a § 1983 cause of action for employment discrimination that violates the Fourteenth Amendment. Congress weighed the vexatiousness of multiple actions for a single offense against the need to assault the evil of discrimination with a varied legal arsenal. Congress found the latter value paramount.

## I.

In determining when Congress intends a statutory remedy to be exclusive, the Supreme Court has increasingly focused on the comprehensiveness of a statute and its remedies. When Congress has enacted a statute that establishes an administrative process for resolving disputes and imposes strict restrictions on private actions, the Court has limited parties to their statutory remedies and has prevented plaintiffs from using a § 1983 cause of action to bypass the administrative process. *See Smith v. Robinson,* 468 U.S. 992, 1009–13, 104 S.Ct. 3457, 3467–69, 82 L.Ed.2d 746 (1984) (decision modified by 20 U.S.C.A. § 1415 (West Supp.1987)); *Bush v. Lucas,* 462 U.S. 367, 385–89, 103 S.Ct. 2404, 2414–17, 76 L.Ed.2d 648 (1983); *Brown v. GSA,* 425 U.S. 820, 829–33, 96 S.Ct. 1961, 1966–68, 48 L.Ed.2d 402 (1976). *Cf. Great American Federal Savings & Loan Association v. Novotny,* 442 U.S. 366, 373–76, 99 S.Ct. 2345, 2349–51, 60 L.Ed.2d 957 (1979); *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 13–15, 101 S.Ct. 2615, 2622–24, 69 L.Ed.2d 435 (1981). Thus, in the absence of a specific congressional intent to the contrary, the comprehensive nature of Title VII is strong evidence that Congress meant the statutory remedy to be exclusive.

A section 1983 suit allows the employee to avoid virtually all of the specific Title VII limitations. A claimant can avoid the 180–day filing requirement because the § 1983 suit is subject to the same statute of limitations as any personal injury action. *Wilson v. Garcia,* 471 U.S. 261, 278, 105 S.Ct. 1938, 1948, 85 L.Ed.2d 254 (1985). An aggrieved employee would not be entitled to a jury trial under Title VII, but would be for her legal claims under § 1983. Moreover, she can sue for compensatory damages and, although she cannot obtain punitive damages from a municipality, *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), she could seek punitive damages by suing a municipal employee directly, *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Title VII, by contrast, is equitable in nature. Most importantly, an employee may be able to "completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII." *Novotny,* 442 U.S. at 376, 99 S.Ct. at 2351.

Before allowing litigants to ignore a statutory scheme as detailed and comprehensive as Title VII, courts must make certain that Congress has expressed its intent in an unambiguous fashion. I concur in the result reached here because, in this case, the legislative record is not murky. It is clear that Congress intended Title VII to be an additional, rather than exclusive, remedy for employment discrimination.

The 1972 Amendments began when Representative Hawkins introduced a bill to extend Title VII coverage to state and federal employees. Although the bill did not state whether Title VII was the exclusive remedy for state employees, the report from the House Committee on Education and Labor noted that the bill preserved a state employee's cause of action under § 1983. H.R.Rep. No. 92–238, 92d Cong., 1st Sess. 18–19 (1971) *reprinted in* Legislative History of the Equal Employment Opportunity Act of 1972, at 78–79 (1972) [hereinafter Legislative History]. The minority members of the committee filed a

separate report, noting that they believed Title VII should be the exclusive remedy, but they had failed to convince a majority of the committee. Legislative History at 126–27.

The minority, however, did convince the whole House that Title VII should be the exclusive remedy. Representative Erlenborn introduced a substitute bill, which provided in part that, except for a claimant's right to sue under Title VII, "a charge filed hereunder shall be the exclusive remedy of any person claiming to be aggrieved by an unlawful employment practice of an employer, employment agency, or labor organization." Legislative History at 326, 329. During debate in the House, Representative Erlenborn noted the unfairness of allowing an employee to bring multiple suits against an employer for the same incident. *Id.* at 231. The House ultimately enacted the Erlenborn substitute bill with its exclusivity provision.

After the House passed this bill, the Senate renewed the debate on exclusivity. Senator Williams introduced a bill without an exclusivity clause, and the accompanying committee report explained that "neither the above provisions regarding the individual's right to sue under Title VII, nor any of the other provisions of this bill, are meant to affect existing rights granted under other laws." Legislative History at 433. In response to the Williams bill, Senator Hruska introduced an amendment that, with a few exceptions, would have made Title VII the exclusive remedy for employment discrimination. *Id.* at 1382.

The Senate conducted extensive debate on the exclusivity issue. Senator Hruska argued that exclusivity would prevent employees from harrassing or blackmailing their employers by bringing more than one lawsuit. *See* Legislative History at 1395–98, 1402, 1509, 1518. Senators Williams and Javits lead the fight for non-exclusivity, arguing that a battery of actions was necessary to fight employment discrimination. *Id.* at 1400, 1403–05, 1511–15, 1517. During the debate, both sides apparently assumed that state employees could bring a § 1983 action before the 1972 amendments and would be able to bring such an action unless the 1972 Amendments contained an exclusivity provision. The Senate finally rejected the Hruska Amendment by a vote of 33–33 and rejected a motion to reconsider the amendment by 50–37. Thus, the Senate version of the 1972 Amendments went to conference without an exclusivity provision.

At conference, the committee had to reconcile the differing House and Senate versions of exclusivity. The Senate version prevailed; the conference bill did not contain an exclusivity provision. The conference report did not discuss this issue, but simply stated that the "House bill provided that charges under Title VII are the exclusive remedy for unlawful employment practices. The House receded." Legislative History at 1815. During the post-conference debates, no Congressman mentioned the exclusivity problem.

In sum, the legislative history shows that the House and Senate extensively debated the effect of the 1972 Amendments on § 1983 causes of action and were aware that, without an exclusivity clause, state employees could still bring a § 1983 suit. Although the House initially supported an exclusivity provision, the Senate desire for non-exclusivity prevailed in the conference bill. Based on this explicit record, I believe that Congress did not intend Title VII to be the exclusive remedy for state employees who allege employment discrimination that violates the Fourteenth Amendment.