**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1476

LEAH P. HOLLIS,

　　　　Plaintiff – Appellant,

　　v.

MORGAN STATE UNIVERSITY; GLORIA GIBSON, in her official and individual capacities; GLENDA PRIME, in her official and individual capacities; CAROLYN ANDERSON, in her official and individual capacities; MYRTLE DORSEY, in her official and individual capacities; DAVID WILSON, in his official and individual capacities; LESIA CRUMPTON-YOUNG, in her official and individual capacities,

　　　　Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Lydia Kay Griggsby, District Judge. (1:19-cv-03555-LKG)

Argued: May 7, 2025　　　　　　　　　　　　　Decided: August 27, 2025

Before THACKER, HARRIS, and QUATTLEBAUM, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished opinion. Judge Harris wrote the opinion, in which Judge Thacker and Judge Quattlebaum concurred. Judge Quattlebaum wrote a concurring opinion.

**ARGUED:** Regina Wang, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Courtney Morgan Watkins, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Viktor K. Dolberg, Student Counsel, Annie Farrell, Student Counsel, Zenia

Grzebin, Student Counsel, Aderson B. Francois, Civil Rights Clinic, Becca Steinberg, Brian Wolfman, Appellate Courts Immersion Clinic, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant.  Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

_____

PAMELA HARRIS, Circuit Judge:

Dr. Leah Hollis alleges that in her former job as a professor at Morgan State University, the university denied her promotions multiple times because of her sex, paid her less than her male colleagues, and retaliated against her when she formally complained of this discrimination. She claims that this conduct, by the university and specific university personnel, violated Title VII, Title IX, Section 1983, and Maryland state law. The district court granted summary judgment to the defendants on all claims. For the reasons given below, we affirm the district court in part, holding that two of Dr. Hollis's Title VII claims are procedurally barred. We reverse the district court with respect to the remaining claims on appeal, concluding that genuine disputes of fact preclude summary judgment, and remand for further proceedings.

## I.

This case began in 2014, when Morgan State University ("MSU") hired Dr. Leah Hollis as a tenure-track Assistant Professor in the School of Education and Urban Studies. Dr. Hollis was given a three-year contract with a starting salary of $60,000 – the lowest end of the starting salary range for such positions in Dr. Hollis's department. Over the next six years, MSU denied Dr. Hollis certain promotions and at one point demoted her to an at-will employee. Dr. Hollis, for her part, filed charges with the Equal Employment Opportunity Commission ("EEOC") complaining of sex discrimination, unequal pay, and retaliation. Eventually, Dr. Hollis was hired by Pennsylvania State University as a Full Professor with tenure, and she left MSU.

3

This is a long-running dispute, and the facts surrounding it are somewhat complex. For context, we begin by outlining the relevant facts, construing the record in the light most favorable to Dr. Hollis, and then turn to the district court decision granting summary judgment to the defendants.[1]

**A.**

1.

Shortly after Dr. Hollis joined the MSU faculty in 2014, a graduate student in Dr. Hollis's department asked then-Department Chair Dr. Glenda Prime about Dr. Hollis's anticipated timeline for acquiring tenure. The student attests that Dr. Prime replied: "Dr. Leah Hollis will never receive her tenure because she is a reject lesbian who will never receive her tenure while I maintain my office." J.A. 1412. When the student indicated that he would report this comment, Dr. Prime allegedly doubled down, telling the student that the male professors – "[her] boys" – and "not a foul mouth reject lesbian" would "get the crown jewel," which in context referred to a tenured faculty position. *Id.* "Dr. Hollis will never receive my blessing of any tenure at my University," Dr. Prime allegedly stated. *Id.* In a meeting a month later, the student inquired once again about Dr. Hollis's tenure timeline. Dr. Prime once again told him that Dr. Hollis would not receive her blessing for

---

[1] In the district court, Dr. Hollis cross-moved for partial summary judgment in addition to opposing the defendants' motion for summary judgment. Because she does not appeal the denial of her cross-motion, we review only the district court's grant of summary judgment to the defendants. Accordingly, where the facts are disputed, we recount them in the light most favorable to Dr. Hollis and draw all reasonable inferences from the record in her favor. *Ray v. Roane*, 93 F.4th 651, 655 (4th Cir. 2024).

tenure because "she's a disgusting lesbian and another reason why I unpaid [*sic*] her so she will leave my campus, very soon!" *Id.*

At the end of her first academic year at MSU, Dr. Hollis submitted a first-year dossier for review by Dr. Prime. According to Dr. Hollis, Dr. Prime never reviewed it. Nor did she follow university policy by assembling a departmental review committee to determine if Dr. Hollis would be renewed for a second three-year contract. The parties dispute whether MSU understood Dr. Hollis to have been granted a second three-year contract term as an Assistant Professor. But it is undisputed that Dr. Hollis did not receive the notification that should have come had she not been continued past her original three-year term, that she was scheduled by MSU to teach classes into a second three-year term, and that she understood her contract to have been extended.

2.

Dr. Hollis's first application for a promotion came in September 2016, at the beginning of her third academic year, when she sought promotion to Associate Professor with tenure and the accompanying increase in salary. Over a year later, after initially deferring a decision, MSU denied Dr. Hollis's tenure application and demoted her to an at-will employee. Because they matter to Dr. Hollis's claims, we detail some of the twists and turns below.

When Dr. Hollis filed her application, a departmental review committee voted in favor of promotion. But Department Chair Dr. Prime – the same Dr. Prime who allegedly referred to Dr. Hollis in derogatory terms – did not agree and instead recommended deferring a decision on the promotion. According to Dr. Prime, Dr. Hollis's research was

5

"unsatisfactory," not because there was not enough of it – she acknowledged Dr. Hollis's "high level of productivity" – but because it sometimes was published in "pay to publish" venues or journals for which Dr. Hollis served on the editorial board.  J.A. 1132–33. Although the next step, according to MSU policy, should have been a school committee review, Dr. Prime's recommendation instead went directly to Dean Patricia Welch, who adopted it.

MSU's President did not act on Dr. Hollis's application until the spring of 2017. Then, at the end of Dr. Hollis's third academic year, the President adopted the deferral recommendation.  Dr. Hollis was notified that she did not then meet "the criteria for promotion and tenure." J.A. 1145.  But the President offered Dr. Hollis a one-year deferral, until the spring of 2018, to supplement her application with additional materials.  If Dr. Hollis did not submit a new application or if a new application was denied, the President instructed, Dr. Hollis's employment at MSU would terminate in June 2018.

Dr. Hollis filed an internal appeal in May 2017, challenging the substance of her evaluations, objecting to procedural irregularities in her review, and alleging gender discrimination and wage inequality.  She also contended that she was entitled, under university policy, to more time in which to resubmit a tenure application.  Her appeal languished until September 2017, when Dr. Hollis sent the MSU administration a draft EEOC charge – which she filed with the EEOC later that month – alleging unlawful discrimination and retaliation for earlier internal discrimination complaints.  The Faculty Appeals Committee then convened, and recommended affirming the deferral of Dr. Hollis's tenure application.  But it agreed with Dr. Hollis that the President had erred in

6

saying that her employment would terminate in 2018 absent a successful reapplication. Dr. Hollis was in the first year of her second three-year contract term, the committee explained, which would expire in 2020. And under MSU policy, Dr. Hollis was eligible to reapply for tenure in the fall of 2018 and again in the fall of 2019.[2]

Initially, then, it seemed that Dr. Hollis's 2016 promotion application would be deferred, and Dr. Hollis would be returned to the normal timeline for a second-term Assistant Professor. But the President came to a different conclusion in December 2017, when he rejected Dr. Hollis's appeal and denied her promotion and tenure. According to a letter accompanying the decision, MSU had now decided that Dr. Hollis's initial three-year employment contract, which began in 2014, had *not* been extended, and had actually expired six months prior, in June 2017. That meant that Dr. Hollis was "currently serving as an 'at will' employee." J.A. 1935. It also meant that Dr. Hollis's 2016 promotion application had been untimely – and was therefore "not eligible for consideration" – because Assistant Professors who serve only one three-year contract term must seek promotion at the start of their second year, which in Dr. Hollis's case would have been the fall of 2015. J.A. 1932. Concluding that Dr. Hollis did "not have a right to appeal the

---

[2] MSU policy dictates that an Assistant Professor who teaches for two three-year terms is eligible to apply (and reapply) for tenure through the start of her fifth year. If an Assistant Professor fails to apply for promotion by the fall of her fifth year of employment – the "second year of the second 3-year term" – then the professor's employment "shall end at the end of the second 3-year contract term," or for Dr. Hollis, in the spring of 2020. J.A. 199.

7

rejection of an ineligible application for promotion and/or tenure," the President denied her appeal without addressing her substantive objections. *Id.*

3.

Dr. Hollis amended her EEOC claim to include the denial of her 2016 application and conversion to "at will" employment. She also applied to MSU for a retroactive renewal of her original 2014 Assistant Professor contract for a second three-year term, which was granted, so that she was once again eligible to apply for promotion.

Dr. Hollis reapplied for a promotion to Associate Professor with tenure in September 2018, while her EEOC charge was pending. The department committee again voted in favor of promotion, but Dr. Prime recommended against. This time, a properly convened school committee voted in favor of Dr. Hollis's promotion, and the Dean followed suit in December. Then Dr. Hollis's tenure application remained pending for months – until April 2019, when the EEOC released its report on Dr. Hollis's charge, finding "reasonable cause to believe" that she had been subjected to discrimination based on sex, unequal pay based on sex, and unlawful retaliation. J.A. 1464. Soon after, on May 6, 2019, the President approved Dr. Hollis's promotion and tenure. Two days after that, MSU asked the EEOC to reconsider its findings in light of Dr. Hollis's promotion. The EEOC declined.

4.

While MSU was evaluating her applications for promotion from 2016 onwards, Dr. Hollis continued to teach, publish, earn grants, and chair dissertation committees. In September 2019, Dr. Hollis, now a tenured Associate Professor, applied for promotion to

8

Full Professor, which would come with another salary increase. That promotion application was denied by the President after the department committee, school committee, and Dr. Prime, now the Dean, recommended against. In response, Dr. Hollis filed a second charge with the EEOC in June 2020, alleging race and sex discrimination and retaliation in connection with her 2019 promotion application.

In September 2020, Dr. Hollis reapplied for promotion to Full Professor, with the same result. Across 2019 and 2020, all three of the male professors in the School of Education and Urban Studies who applied for promotion to Full Professor were promoted. The other female professor who applied was, like Dr. Hollis, denied promotion.

**B.**

Dr. Hollis filed her initial complaint in federal district court on December 13, 2019, raising claims regarding the denial of her 2016 promotion application. The EEOC, recall, had issued findings in April 2019 on Dr. Hollis's first charge, covering the 2016 application, and on September 20, 2019, it had issued Dr. Hollis a right-to-sue letter.

But six months after she filed her initial complaint in district court, Dr. Hollis filed her second EEOC charge, alleging discrimination and retaliation in connection with the denial of her 2019 application for promotion to Full Professor. On February 9, 2021, the EEOC issued Dr. Hollis a right-to-sue letter on that second charge. Four months later, on June 29, 2021, Dr. Hollis amended her district court complaint, adding claims not only about the denial of her 2019 application for promotion to Full Professor but also about the denial of her re-application in 2020.

9

The amended complaint's allegations relevant to this appeal fall into three categories. First, Dr. Hollis alleges discrimination on the basis of sex with respect to the denial of her promotion applications in 2016, 2019, and 2020, in violation of Title VII, Title IX, Section 1983 (under which she brings an Equal Protection claim), and the Maryland Fair Employment Practices Act ("MFEPA"). Second, she alleges wage discrimination – specifically, that she was underpaid compared to her male colleagues – across her time at MSU, in violation of the federal Equal Pay Act, the Maryland Equal Pay for Equal Work Act, Title VII, and the MFEPA. And third, Dr. Hollis alleges that her 2017 demotion to at-will status was unlawful retaliation for filing her first EEOC complaint, in violation of Title VII, Title IX, and the MFEPA.

The defendants moved for summary judgment on all claims,[3] and Dr. Hollis cross-moved for partial summary judgment on her wage inequality claims. The district court granted the defendants' motion in full, and denied Dr. Hollis's cross-motion. *Hollis v. Morgan State Univ.*, No. 19-cv-3555-LKG, 2024 WL 2113631, at *25 (D. Md. May 10, 2024). Below, we describe the district court's disposition of the claims Dr. Hollis raises on appeal – her claims of sex discrimination in her 2016, 2019, and 2020 promotion applications; her claim of retaliation in her demotion to an at-will employee in 2017; and

---

[3] Dr. Hollis named as defendants MSU and six MSU administrators, including Dr. Prime and President David Wilson, in their individual and official capacities. For ease of reference, we will sometimes refer to the defendants collectively as MSU.

her claim of wage inequality throughout her employment.[4]

1.

The district court began with Dr. Hollis's sex discrimination claims regarding the denial of her promotion applications in 2016, 2019, and 2020. And at the threshold, the court concluded that her claims regarding 2019 and 2020 were procedurally barred.

Dr. Hollis's 2019 claims, the court reasoned, were untimely. *Hollis*, 2024 WL 2113631, at *17. Title VII requires plaintiffs to file in district court within 90 days of receiving a right-to-sue letter. 42 U.S.C. § 2000e-5(f)(1). Dr. Hollis received a right-to-sue letter on her second EEOC charge – regarding her 2019 promotion application – on February 9, 2021, but waited 140 days to amend her complaint to include her new claims. And Dr. Hollis's 2020 claims, the court held, had not been exhausted before the EEOC because Dr. Hollis's second EEOC charge, filed in June 2020, did not cover the promotion application she subsequently filed in September 2020 or MSU's denial of that application in May 2021. *Hollis*, 2024 WL 2113631, at *17. On those grounds, the court granted summary judgment to MSU on Dr. Hollis's 2019 and 2020 sex discrimination claims not only under Title VII but also under Title IX, Section 1983, and the MFEPA.

That left Dr. Hollis's sex discrimination claim regarding the denial of her 2016 application for promotion and tenure. The court addressed first the derogatory statements

---

[4] As noted earlier, Dr. Hollis does not appeal the denial of her cross-motion for summary judgment. Nor does she appeal the grant of summary judgment to the individual defendants on her Title VII, Title IX, and MFEPA claims; to all defendants on claims arising from her non-selection for certain program positions; or to all defendants on claims under the Family and Medical Leave Act.

allegedly made by Dr. Prime, asserting that she would block Dr. Hollis, a "reject lesbian," from receiving tenure, a status that should be reserved for her "boys." J.A. 1412. Those statements, the district court concluded, did not constitute "direct" evidence of sex discrimination because they were "temporally remote" – allegedly made in 2014, two years before Dr. Prime recommended against granting tenure to Dr. Hollis – and because Dr. Prime was "neither the only decision maker, nor the final decision maker" on Dr. Hollis's 2016 application. *Hollis*, 2024 WL 2113631, at *18.

The court then moved on to consider whether Dr. Hollis could make a case through circumstantial evidence giving rise to an inference of sex discrimination. Here, the court did not consider Dr. Prime's alleged statements. Instead, it held that Dr. Hollis could not make a showing of sex discrimination because "the undisputed material facts" established that MSU denied her 2016 tenure application "due to her lack of a strong publication history" at the time. *Id.* at *19. And while the court seemed to agree that Dr. Hollis had identified deviations from MSU policy in the consideration of her application, there was "no evidence," it reasoned, that "any deviation . . . was due to [Dr. Hollis's] gender." *Id.* Accordingly, the court held, Dr. Hollis could not "establish an inference that her gender was the reason" for the denial of her 2016 application, and MSU was entitled to summary judgment on Dr. Hollis's sex discrimination claims. *Id.* at *20.

2.

The district court also granted summary judgment to MSU on Dr. Hollis's wage discrimination claims under the federal Equal Pay Act and Maryland's state analogue. The district court agreed with Dr. Hollis that she had established a prima facie case of sex-based

12

wage discrimination: It was undisputed that Dr. Hollis's starting salary of $60,000 was at the bottom of the salary range for her position in her department, and that nine of the ten male comparators Dr. Hollis identified received a higher starting salary. *Id.* at *21. But, the court concluded, MSU had met its burden, as a matter of law, of showing that this wage differential was justified by factors other than gender. As the district court saw it, "undisputed material facts" made clear that Dr. Hollis's comparators had more community-college related experience, that several of them had stronger publication histories, and that their starting salaries otherwise reflected university needs unrelated to gender. *Id.*

3.

Finally, the district court granted summary judgment to MSU on Dr. Hollis's claim that it had retaliated against her in violation of Title VII, Title IX, and the MFEPA. *Id.* at *22. The court did not doubt that Dr. Hollis had engaged in protected activity when she filed a charge with the EEOC in September 2017, after the initial deferral of her 2016 promotion application. Nor did it question that Dr. Hollis's designation as an at-will employee in December 2017 – when MSU declared for the first time that her term-contract had never been renewed – constituted an adverse action. But the court held that Dr. Hollis had pointed to no evidence showing that her December conversion to at-will status was caused by her September protected activity, emphasizing that Dr. Hollis had produced no evidence of "retaliatory animus" on the part of the decisionmakers. *Id.* at *22–23.

13

**II.**

We review the district court's grant of summary judgment de novo. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases arising in the employment discrimination context, like this one, "courts must take special care when considering a motion for summary judgment . . . because motive is often the critical issue." *Evans*, 80 F.3d at 958. If after reviewing the record as a whole, in the light most favorable to Dr. Hollis as the non-movant, "we find that a reasonable jury could return a verdict for [Dr. Hollis], then a genuine factual dispute exists and summary judgment is improper." *Id.* at 958–59.

After carefully reviewing the lengthy record in this case, we conclude that the district court erred in holding that no reasonable jury could find for Dr. Hollis on any of her claims. We agree with the district court that Dr. Hollis's Title VII sex discrimination claims regarding her 2019 and 2020 promotion applications are procedurally barred. But we reverse the district court's grant of summary judgment as to Dr. Hollis's other claims on appeal and remand for further proceedings consistent with this opinion.

**A.**

We begin where we agree with the district court: Dr. Hollis's Title VII claims regarding her applications for promotion to Full Professor in 2019 and 2020 are procedurally barred.

14

First, as the district court explained, Dr. Hollis's Title VII claim arising from the denial of her 2019 application is time-barred. Under Title VII, Dr. Hollis was required to exhaust her claim by filing a charge with the EEOC, and then, upon receiving a right-to-sue letter, file her claim in court within 90 days. 42 U.S.C. § 2000e-5(e)(1), (f)(1).[5] It is undisputed that Dr. Hollis administratively exhausted her 2019 claim when she filed her second EEOC charge in June 2020, and she received a right-to-sue notice for that claim on February 9, 2021. At that point, Dr. Hollis already had pending in court her original complaint, challenging the denial of her 2016 application for promotion and tenure. But she did not amend her complaint to include claims about her 2019 promotion until June 29, 2021 – 140 days after the right-to-sue notice, and well outside the statutory deadline.

In response to this undisputed arithmetic, Dr. Hollis argues that the 2019 claim in her amended complaint should be treated as "filed" as of the date of her original complaint, because it "relates back" to the 2016 claim in that complaint. An amendment "relates back to the date of the original pleading" when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). This relation-back doctrine, we have explained, requires "a factual nexus between the amendment and the original complaint," *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir. 1983), and new claims do not relate back to original claims if they "arise from

---

[5] These are not jurisdictional requirements, but if timely asserted by defendants – as they were here – they are procedural bars to judicial relief. *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 543 (2019).

15

separate occurrences of 'both time and type,'" *United States v. Pittman*, 209 F.3d 314, 318 (4th Cir. 2000).

Here, as Dr. Hollis concedes, her 2016 and 2019 applications were "discrete acts." The applications sought different things – in 2016, tenure and a promotion to Associate Professor; in 2019, post-tenure, a promotion to Full Professor. Coming three years apart, they were based on different application materials. They were subject to different standards, and rejected for different (purported) reasons. It is not enough, as Dr. Hollis suggests, that her two claims involve the same defendants and the same basic theory of liability. *See Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006). What matters is that Dr. Hollis's 2019 claim does not arise from the same conduct or occurrences as her 2016 claim, instead adding new facts – new conduct, new occurrences – to form the basis for a new claim. *See Pittman*, 209 F.3d at 318; 6A Charles Alan Wright et. al., Fed. Prac. & Proc. Civ. § 1497 (3d ed.), Westlaw (updated May 20, 2025). Dr. Hollis's Title VII sex discrimination claim regarding her 2019 promotion does not "relate back" to the date of her original pleading and is therefore barred as untimely.

It follows, we conclude, that Dr. Hollis's Title VII sex discrimination claim regarding her 2020 application is likewise barred. It is undisputed that Dr. Hollis did not separately exhaust this claim by filing a separate charge with the EEOC after MSU denied her 2020 promotion request. Instead, Dr. Hollis argues that her 2020 claim falls within the scope of her earlier EEOC charge, filed in June 2020 and targeting the denial of her 2019 promotion application. Given our holding above, however, that argument cannot prevail.

16

Dr. Hollis is correct that we "allow[] a claim to relate back to an EEOC charge even when the claim arose after the charge," *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 303 (4th Cir. 2009), *abrogated on other grounds by Fort Bend Cnty. v. Davis*, 587 U.S. 541 (2019), if the claim falls within "the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination," *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).  But that works only where the original EEOC charge properly gives rise to the litigation before us.  *See Jones*, 551 F.3d at 304.  And here, we have already held that the June 2020 EEOC charge cannot be the basis for litigation, because Dr. Hollis failed to timely amend her district court complaint to add any claims exhausted by that charge.  Even assuming Dr. Hollis's 2020 claims were exhausted by her June 2020 EEOC charge, in other words, they, like her 2019 claims, are procedurally barred as untimely.

In sum, we agree with the district court that Dr. Hollis's Title VII sex discrimination claims related to her 2019 and 2020 promotion applications are procedurally barred.  But the district court went further than that:  Relying on Title VII's procedural requirements, it granted MSU summary judgment not only on Dr. Hollis's *Title VII* sex discrimination claims regarding 2019 and 2020, but also on her Title IX, Section 1983, and state law MFEPA claims as to 2019 and 2020.  But those provisions are not governed by the Title VII procedural requirements at issue here.  *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (no administrative exhaustion requirement for Title IX); *Keller v. Prince George's Cnty.*, 827 F.2d 952, 955 (4th Cir. 1987) (Title VII's exhaustion requirement does not apply to Section 1983 claims); Md. Code Ann., State Gov't § 20-1013 (West 2025) (distinct MFEPA exhaustion requirements without 90-days-to-file rule).

17

We thus reverse the district court's grant of summary judgment to MSU on Dr. Hollis's 2019 and 2020 sex discrimination claims under the MFEPA, Title IX, and Section 1983. And while MSU suggests we consider the merits of those 2019 and 2020 claims for the first time on appeal, we decline to do so, and leave that instead to the district court on remand. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 515 (4th Cir. 2015) ("The district court is in a better position to consider the parties' arguments in the first instance, which can be presented at length rather than being discussed in appellate briefs centered on the issues the district court did decide.").

**B.**

We turn next to the merits of Dr. Hollis's discrimination, retaliation, and wage inequality claims.[6] The district court found that the evidentiary record foreclosed, as a matter of law, all of these claims. We disagree. On our evaluation of the record, we find that Dr. Hollis has satisfied her summary judgment burden, identifying genuine disputes of material fact that are for a jury to decide. In particular, we think a reasonable jury could find that MSU's purported reasons for denying Dr. Hollis's 2016 promotion application, demoting her to at-will status, and paying her at a rate lower than her male colleagues are pretextual, and that the district court erred by resolving this case at summary judgment.

---

[6] On the merits of these claims, we agree with the parties and district court that Dr. Hollis's Title VII, Title IX, Section 1983 Equal Protection, and MFEPA claims are relevantly similar and can be addressed together, and that Dr. Hollis's federal and state equal pay claims are relevantly similar and can be addressed together.

18

1.

We begin with Dr. Hollis's claim that MSU unlawfully discriminated against her by failing to promote her to Associate Professor with tenure when she applied in 2016. Dr. Hollis argues that a reasonable jury could infer – based on statements of animus, treatment of comparators, and evidence that MSU's stated and shifting rationales were pretextual – that the reason she was denied the promotion was because of her sex. We agree, and conclude that this claim rests on disputes of material fact that are for a jury to decide.

The district court evaluated Dr. Hollis's claim under the familiar *McDonnell Douglas* framework and purported to find only that Dr. Hollis had failed to establish a prima facie case of discrimination. *Hollis*, 2024 WL 2113631, at *19, *20 n.9. In fact, the district court went further, and also concluded that MSU's proffered legitimate and non-discriminatory reason for denial of Dr. Hollis's promotion – or at least one of them – was, as a matter of law, the actual reason for MSU's action and not a pretext for discrimination. *See id.* at *19 ("[T]he undisputed material facts show that the University denied [Dr. Hollis's] application due to her lack of a strong publication history at that time."). We need not parse the back-and-forth of the *McDonnell Douglas* framework here. It is enough that this record contains circumstantial evidence – including evidence of pretext – that would allow a jury to infer that the reason for Dr. Hollis's non-promotion was sex discrimination.

First, there are the alleged statements of Dr. Prime. According to the sworn affidavit of a graduate student, Dr. Prime used extremely derogatory language to convey her

discriminatory animus against Dr. Hollis – labeled a "reject lesbian" – and her commitment to ensuring that tenure in her department would be reserved for her "boys" – the male professors – and denied to Dr. Hollis. J.A. 1412; *see also id.* ("Dr. Hollis will never receive my blessing of any tenure at my University."). Dr. Prime may not have been the final decisionmaker on Dr. Hollis's promotion request, as MSU argues. But she was the Chair of Dr. Hollis's department, and after a department committee voted in favor of promotion, it was Dr. Prime who rejected that outcome and instead recommended deferral – a recommendation the Dean adopted without first convening the school committee dictated by university policy. And if a jury credited the graduate student's account – which, to be clear, Dr. Prime denies – then it could also find that Dr. Prime's efforts were the result of discriminatory animus.

The district court, however, considered none of this. Instead, having concluded that Dr. Prime's alleged statements did not qualify as "direct" evidence of discrimination, it took them out of the analysis entirely. That was error. Even if, as the district court held, comments made in 2014 by someone who was not the final 2016 decisionmaker were insufficient by themselves to establish intentional sex discrimination, *Hollis*, 2024 WL 2113631, at *18, those alleged comments remained relevant circumstantial evidence that could support an inference of discrimination. *Cf. Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 324–25 (2025) (Thomas, J., concurring) (use of *McDonnell Douglas* framework should not prevent Title VII plaintiffs from proving claims with all available direct or circumstantial evidence).

20

Next, there is the genuine factual dispute Dr. Hollis has identified about the rationale on which the district court relied to reject her sex discrimination claim: that MSU denied Dr. Hollis a promotion in 2016 not because of sex discrimination but because she "lack[ed] [] a strong publication history." *Hollis*, 2024 WL 2113631, at *19. That was indeed the reason given by Dr. Prime for her negative recommendation on promotion. Although Dr. Hollis had authored two books, a book chapter, and seven articles in two years – which Dr. Prime conceded was a "high level of productivity" – Dr. Prime faulted Dr. Hollis for having published three articles in pay-to-publish journals and two in journals where she held membership on the editorial boards. J.A. 1132–33. And MSU appeared to embrace that rationale when it first declined to promote Dr. Hollis in May 2017. But Dr. Hollis has "amass[ed] circumstantial evidence that [] undermines the credibility" of that stated concern. *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). For instance, even accepting MSU's criticisms of five of her articles, that would leave Dr. Hollis with two as to which MSU had no issue – and at least one of her male colleagues was promoted to Associate Professor with tenure after publishing just two "unaffiliated, non-pay-to-publish" journal articles. J.A. 2715–16. Universities are of course permitted to apply subjective criteria in their hiring and promotion determinations, and Dr. Hollis cannot prevail simply by disputing MSU's assessment of her scholarship. *See, e.g.*, *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 566 (4th Cir. 2011). But she is entitled to dispute the credibility of the concerns asserted first by Dr. Prime and then by MSU, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000), and she has produced evidence to do so here.

21

And then there is the undisputed fact that scholarship concerns were *not* the reason cited when Dr. Hollis's promotion application was finally denied by the University President. That was the reason alluded to when Dr. Hollis was first notified, in May 2017, that her 2016 application would not be granted. J.A. 1145 (explaining that Dr. Hollis did not meet "the criteria for promotion and tenure"). But after Dr. Hollis filed an internal appeal disputing the stated concerns about her scholarship, the defendants backed away from Dr. Prime's qualification-based rationale and switched – rather suddenly, if we read the record in the light most favorable to Dr. Hollis – to a new rationale: Dr. Hollis, it turned out, had not been reappointed to a second three-year term as an Assistant Professor, which meant that her application for a promotion was untimely and therefore "not eligible for consideration." J.A. 1932. The defendants, in other words, have "offered different justifications at different times" for Dr. Hollis's non-promotion, which "in and of itself" is evidence of "pretext." *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001).

We appreciate, as MSU argues, that a university may have multiple bona fide reasons for denying a promotion, and that its earlier focus on Dr. Hollis's qualifications does not necessarily mean that it did not also have a legitimate concern about the timeliness of Dr. Hollis's application. And a reasonable jury might reach just that conclusion. But it also might not, because viewing the record in the light most favorable to Dr. Hollis, there is evidence to support a jury finding that MSU's late-breaking "timeliness" rationale is not credible. The premise for that rationale, again, is that Dr. Hollis was never appointed to a second three-year contract term when her first expired in the spring of 2017. But until the

22

President's December 2017 discovery that Dr. Hollis was actually an at-will employee, nobody in Dr. Hollis's lengthy tenure process had thought to question her status, and the Faculty Appeals Committee had expressly confirmed that Dr. Hollis was in her second three-year contract term. And there was good reason for the Faculty Appeals Committee to think so: Dr. Hollis had never received the written notice that would be required if her first three-year term had *not* been renewed, and the university had scheduled Dr. Hollis to teach a fourth year of classes without any intimation that she would be doing so in a different status. Indeed, MSU has not pointed to any other case in which a tenure-track Assistant Professor continued to teach at the University after being demoted to an at-will employee. From all of this, a reasonable jury could infer that MSU's proffered "untimeliness" rationale for non-promotion was pretextual as "inconsistent over time, false, or based on mistakes of fact." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021).

Finally, there are the indications that MSU failed to follow its own internal policies in dealing with Dr. Hollis's 2016 application. The district court acknowledged that Dr. Hollis presented evidence of deviation from university policies, pointing to the "significant delay" in resolving Dr. Hollis's promotion request. *Hollis*, 2024 WL 2113631, at *19. And there was also, for instance, Dr. Prime's failure to assemble a review committee to consider renewing Dr. Hollis for a second three-year contract, and the Dean's adoption of Dr. Prime's deferral recommendation before a school committee's review. The district court thought none of this was relevant because Dr. Hollis had not shown that "any deviation . . . was due to [her] gender." *Id.* But that gets things backwards: The deviations

23

*themselves* are the circumstantial evidence from which pretext and discriminatory intent may be inferred. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."); *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (noting deviation from usual procedure as evidence of pretext).

When we take all this evidence together, we conclude, contrary to the district court's assessment, that a jury would not be compelled to accept MSU's proffered non-discriminatory reason – or reasons – for denying Dr. Hollis's 2016 promotion application. Instead, it could find that MSU's shifting rationales were pretextual, and infer both from that finding and from other record evidence that sex discrimination was the real reason for Dr. Hollis's non-promotion. *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 727 (4th Cir. 2019) (jury may infer "ultimate fact" of discrimination from "falsity" of proffered explanation). Accordingly, we reverse the district court's grant of summary judgment on Dr. Hollis's sex discrimination claims arising from the denial of her 2016 promotion application.

2.

We turn next to Dr. Hollis's retaliation claims because they, too, arise from her 2016 promotion application, and much of the analysis is overlapping. In the course of denying that application in December 2017, as described above, MSU determined that Dr. Hollis's original three-year Assistant Professor contract had never been renewed, and MSU converted her to an at-will employee. Dr. Hollis alleges that this "demotion" was in

24

retaliation for the EEO complaint she circulated to the University and then filed with the EEOC in September 2017.

The district court rejected her claims and granted summary judgment to MSU, holding that Dr. Hollis had not identified any evidence showing that her demotion was the result of "retaliatory animus" on the part of the defendants. *Hollis*, 2024 WL 2113631, at *22–23. But Dr. Hollis was not required to present direct evidence of retaliatory animus or motive. She also can prevail on circumstantial evidence that would allow a reasonable jury to infer retaliation, including evidence of temporal proximity between her protected activity and her demotion. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021). And because MSU has offered a purported non-retaliatory reason for the adverse action – that Dr. Hollis in fact had never been renewed as a contracted Assistant Professor – the ultimate question is whether Dr. Hollis can establish that this stated reason is pretextual and that retaliation was the "real reason" – that is, a "but-for cause" – for her demotion. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015).

We conclude that Dr. Hollis has proffered evidence from which a reasonable jury could reach that conclusion. There is no dispute that Dr. Hollis engaged in protected activity by circulating her EEO complaint internally and then filing it with the EEOC in September 2017, or that MSU took an adverse action against her when it demoted her to at-will status in December 2017. That means that protected activity and adverse action were separated by less than three months – a degree of temporal proximity that our precedent suggests may allow a jury to infer a causal connection. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (allowing inference of causation from four-month period

25

between protected activity and adverse action). Moreover, there was virtually no gap between Dr. Hollis's EEO complaint and the beginning of the process that would end with Dr. Hollis's demotion: Almost as soon as that complaint was shared and filed, the Faculty Appeals Committee convened to consider Dr. Hollis's appeal – which had been pending for months – and send a recommendation to the President. The three-month period, in other words, tracked the defendants' own processes for acting against Dr. Hollis, with the retaliatory action occurring at the "natural decision point." *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003).[7]

The defendants have, as noted above, advanced a non-retaliatory and legitimate reason for Dr. Hollis's demotion to at-will status: the purported discovery in December 2017 that she had never been renewed for a second three-year term as an Assistant Professor. But genuine factual disputes prevent granting summary judgment on this basis. As we have already explained in connection with Dr. Hollis's sex discrimination claims, there is record evidence from which a reasonable jury could conclude that MSU did not actually believe that Dr. Hollis's contract had lapsed, and was instead using that excuse as a pretext to mask the real reason for its decisions. Taking all the evidence together, these disputes would allow a reasonable jury to conclude that the defendants' rationale was

---

[7] MSU relies on *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 126–27 (4th Cir. 2021), in which we held that a three-month period between protected activity and adverse action was too long to independently establish a causal link. But this is a fact-specific inquiry, and *Roberts* relied also on the absence of evidence that the employer had knowledge of the protected activity, *id.* – which the defendants here do not dispute. And *Roberts* did not involve the kind of lengthy process that bridges the temporal gap here.

pretextual and to infer that a retaliatory motive was the "real reason" for her demotion. *See Foster*, 787 F.3d at 252. We thus reverse the grant of summary judgment to MSU on Dr. Hollis's retaliation claims.

3.

Lastly, we address Dr. Hollis's wage inequality claims. Dr. Hollis alleges that throughout her years at MSU – beginning but not ending with her starting salary – the University underpaid her in comparison to her male colleagues, in violation of the federal Equal Pay Act and its Maryland counterpart, the Maryland Equal Pay for Equal Work Act (here, the "Maryland Pay Act"), as well as under Title VII and the MFEPA.

The district court concluded, and the defendants do not contest on appeal, that Dr. Hollis established a prima facie case of wage discrimination, showing that she was paid less than colleagues of the opposite sex who performed equal work on jobs that required equal skills, effort, and responsibility and were performed under similar working conditions. *See Hollis*, 2024 WL 2113631, at *20 (citing *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019) (outlining standard)). Indeed, it is undisputed that Dr. Hollis's starting salary of $60,000 was at the very bottom of the range for Assistant Professors in her department and below the starting salaries of nine of her ten male comparators. *Id.* at *21.

Under the Equal Pay Act and the Maryland Pay Act, MSU now bears the summary judgment burden of showing, as a matter of law, that these wage differentials are justified by a "factor other than sex." 29 U.S.C. § 206(d)(1); *U.S. Equal Emp. Opportunity Comm'n v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018). MSU can meet that burden only if

27

the record establishes, beyond any genuine dispute, that MSU's "proffered reasons *do in fact* explain the wage disparity" and "not simply that [their] proffered reasons *could* explain the wage disparity." *Md. Ins. Admin.*, 879 F.3d at 121. Under Title VII and the MFEPA – unlike the Equal Pay Act, *see id.*, – the ultimate burden remains with Dr. Hollis to identify evidence from which a reasonable jury could conclude that MSU's proffered explanation for the wage disparity is pretextual and that MSU was in fact motivated by discriminatory intent. *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994).

Having carefully reviewed the record, we conclude, first, that the district court erred in holding that there was no evidence that would allow a jury to reject MSU's proffered gender-neutral reason for the disparity in starting salaries between Dr. Hollis and her comparators. *See Hollis*, 2024 WL 2113631, at *20. MSU argues, in a nutshell, that it paid Dr. Hollis's male colleagues higher starting salaries primarily because they were better qualified, having more community-college experience and stronger publication histories at the time of hiring. And it offers record evidence in support of that argument, pointing to several comparators with extensive prior work at community colleges, and others who had substantial publication records when they were hired by MSU. *Id.* at *21 (discussing evidence). We do not doubt that a jury could conclude that the defendants believed in the stronger qualifications of those candidates, and set Dr. Hollis's lower salary accordingly.

But we think a jury also could doubt whether MSU "in fact objectively weighed the comparators' qualifications" in the way it now posits. *See Md. Ins. Admin.*, 879 F.3d at 123. There is, for instance, a factual dispute over whether MSU actually gave the significance it now ascribes to community-college experience *in setting salaries*: MSU

28

found Dr. Hollis "well qualified" to be hired based on the community college experience she did have and her "wide experience at other Higher Education institutions," and Dr. Hollis has produced evidence that none of MSU's written materials indicated community-college experience would be more monetarily valued than other higher education administration experience. J.A. 895; *see also* J.A. 798. A reasonable jury also might agree with Dr. Hollis that to the extent MSU was setting salaries based on community-college experience, it assessed her qualifications differently than those of her male colleagues – discounting the research she had conducted on community colleges, and the leadership position she had held at a community college. And for purposes of her Title VII and MFEPA claims, we think a jury also could infer, given the entire record in this case – including the alleged statements of Dr. Prime – that some or all of MSU's justifications for these disparate starting salaries are not credible, and that the real reason is sex discrimination. *See* J.A. 1412 (sworn attestation that Dr. Prime said of Dr. Hollis that "she's a disgusting lesbian and *another reason why I unpaid [sic] her so she will leave my campus*" (emphasis added)).

There is also a second problem with granting summary judgment to MSU on these claims. As noted above, Dr. Hollis's wage discrimination claim extends beyond the time of her initial hiring, and rests on evidence that a pay disparity between herself and her male colleagues persisted throughout her time at MSU. And Dr. Hollis has identified evidence – some of which we discussed in connection with her sex discrimination claim – that after her original hiring, she developed a publication record equal or superior to that of her male comparators, as well as other strong qualifications.

29

MSU disputes none of that. Instead, it says that any post-hiring evidence is irrelevant: So long as the initial disparity in starting salaries was based on qualifications and not sex, then continuing salary differentials "based on [the] unequal starting salaries" do not violate the Equal Pay Act. Br. of Appellees at 52 (quoting *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 920 (9th Cir. 1983)). But by its own terms, that theory would not apply to cases like this one, where an employee's subsequent salary is not based *solely* on her starting salary, but can instead be increased, or not, at the discretion of her employer – here, through merit raises or promotion – for lawful or discriminatory reasons. We explained as much in *U.S. Equal Employment Opportunity Commission v. Maryland Insurance Administration*, where we reasoned that an employer's use of a "facially neutral" salary schedule did not foreclose an Equal Pay Act claim where the employer "exercise[d] discretion each time it assign[ed] a new hire to a specific step and salary range based on its review of the hire's qualifications and experience." 879 F.3d at 123. That room for discretion, we found, made it possible that the employer "at least in part based its assignment of the claimants' step levels on their gender," resulting in a "diminution" of their salaries. *Id.*

The same is true here. In her time at MSU, Dr. Hollis applied for three promotions that would have brought salary increases and one merit raise, in July 2020, to match her salary to that of comparable male professors. Each time, MSU exercised discretion in reviewing Dr. Hollis's qualifications and experience and determining that she did not meet the promotion or raise criteria – with the result that her salary remained the same. Accordingly, we reject MSU's view that evidence of Dr. Hollis's post-hiring qualifications

30

is irrelevant to her wage discrimination claim. Instead, such evidence must be considered in evaluating whether MSU impermissibly allowed an initial pay gap to persist and grow by denying Dr. Hollis's promotion applications and her request for a merit raise.

MSU, again, has not sought to defend the wage disparity that Dr. Hollis experienced after her initial hiring, and the district court did not address that issue, either. Normally, we might leave this question to the district court on remand. But here, we have held already that there is a genuine dispute of fact as to whether, but for sex discrimination, MSU would have granted Dr. Hollis's 2016 promotion application, which would have brought with it a raise in salary. To the extent Dr. Hollis's evidence generates a jury question on whether her promotion applications were denied as a result of sex discrimination, it also generates a jury question on whether discrimination caused her salary to remain lower than her male colleagues'. Accordingly, for this reason, too, the district court erred in granting summary judgment to MSU on Dr. Hollis's wage discrimination claims.

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the defendants with respect to Dr. Hollis's 2019 and 2020 Title VII sex discrimination claims. We reverse the district court's grant of summary judgment to the defendants with respect to all other claims on appeal. We remand those claims to the district court for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

31

QUATTLEBAUM, Circuit Judge, concurring:

When someone says, "watch this, hold my beer," what follows rarely turns out well.[1] The same is true when judges make up tests inconsistent with the statutory text that Congress enacted. A good example of this is the Title VII burden-shifting framework announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). What began as a tool for processing evidence in a Title VII bench trial has far too often turned into the substantive test for intentional discrimination at summary judgment. This approach counter-textually limits what counts as discrimination under Title VII, demands more proof than the Federal Rules require at summary judgment and is unnecessarily complex.

The majority does not "parse the back-and-forth of the *McDonnell Douglas* framework." Maj. Op at 19. Instead, it goes straight to pointing out the evidence that creates a genuine dispute of material fact of discrimination under Title VII, and Dr. Hollis' other claims. I certainly take no issue with that approach. Indeed, as explained below, I think that is the way these claims should be considered at summary judgment. But because the district court *did* engage in the *McDonnell Douglas* burden-shifting framework, I take this opportunity to express my views on *McDonnell Douglas*, or at least how it is all too often

---

[1] While the phrase goes back to the mid-twentieth century, comedian Jeff Foxworthy popularized a variation of the joke in the 1990s. *See* JEFF FOXWORTHY, NO SHIRT, NO SHOES . . . NO PROBLEM! 31 (1996). More recently, Chris Young used the phrase as the title of a country music song. *See* CHRIS YOUNG, *Hold My Beer Watch This*, *on* Famous Friends (CD, RCA / SME Aug. 6, 2021). If others deserve credit, I apologize for omitting them.

applied. In the end, while I fully join in the majority's decision, I join those urging the Supreme Court to clarify or overturn *McDonnell Douglas*.[2]

## I. How Did We Get Here?

Congress enacted Title VII as part of the Civil Rights Act of 1964. The statute makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).

Almost a decade later, in *McDonnell Douglas*, the Supreme Court described the ultimate Title VII issue for trial as whether a plaintiff was denied employment because of his race. 411 U.S. at 801. No issue there. That comports with Title VII's text. But the Court

---

[2] Make no mistake, I am no pioneer here. Others have criticized *McDonnell Douglas* for engendering confusion and unfairness. *See, e.g.*, *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1221–28 (10th Cir. 2003) (Hartz, J., writing separately); *Griffith v. City of Des Moines*, 387 F.3d 733, 746–48 (8th Cir. 2004) (Magnuson, J., concurring specially); The Honorable Timothy M. Tymkovich, *The Problem with Pretext*, 85 DENV. U. L. REV. 503 (2008); *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *Coleman v. Donahoe*, 667 F.3d 835, 862–63 (7th Cir. 2012) (Wood, J., concurring); *Walton v. Powell*, 821 F.3d 1204, 1210–11 (10th Cir. 2016); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 351 (5th Cir. 2019) (Costa, J., specially concurring). Some have focused on the tension between *McDonnell Douglas* and the summary judgment standard. *See, e.g.*, *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016); *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 949–58 (11th Cir. 2023) (Newsom, J., concurring). And recently, several Supreme Court Justices have expressed an interest in revisiting *McDonnell Douglas* and clarifying its role. *See Hittle v. City of Stockton*, 145 S. Ct. 759, 760–64 (2025) (Thomas, J., with Gorsuch, J. joining, dissenting from the denial of certiorari); *Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1548–55 (2025) (Thomas, J., with Gorsuch, J. joining, concurring). If not original, I hope to at least build off their good work.

33

went further. It developed a rule for the Title VII "burden of proof and how this shifts upon the making of a prima facie case." *Id.* First, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *Id.* at 802. That showing could be made by demonstrating: (1) the plaintiff belongs to a racial minority; (2) he applied and was qualified for an open job; (3) despite qualifications, the plaintiff was rejected; and (4) the position remained open after the rejection, and the employer sought a similarly qualified person. *Id.* Second, the burden "must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Third, the burden swings back to the plaintiff, who has an opportunity "to show that [the employer's] stated reason for [the plaintiff's] rejection was in fact pretext." *Id.* at 804. The Supreme Court then sent the case back for a retrial. *Id.* at 807.

A careful reader will ask, where did this rule come from? The Court didn't say. It doesn't appear in the statute's text. But just a few years later, the Court described *McDonnell Douglas*' original purpose. According to the Court, *McDonnell Douglas* set forth "the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252 (1981). The Court cautioned that the *McDonnell Douglas* burden-shifting framework was "never intended to be rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

34

Notably, *McDonnell Douglas* was on appeal from a bench trial. *See* 411 U.S. at 797–98. In fact, Title VII *only* provided for bench trials until 1991, when Congress established a right to a jury trial in employment discrimination cases. *See Hittle*, 145 S. Ct. at 761 n.1 (Thomas, J., dissenting) (citing Civil Rights Act of 1991, § 102, 105 Stat. 1073). Thus, *McDonnell Douglas* simply explained how the ordering of evidence should occur at a bench trial, without giving any consideration to what a plaintiff needs to survive summary judgment. To repeat, the purpose of *McDonnell Douglas* was not substantive; it was an evidentiary framework for trials in a bygone era when judges, not juries, decided Title VII cases.

## II.  What Changed?

*McDonnell Douglas*' purpose is no longer so restrained.[3] As sometimes happens when judges make rules not found in a statute's text, the boundaries tend to expand. *See Stinnie v. Holcomb*, 77 F.4th 200, 230 (4th Cir. 2023) (en banc) (Quattlebaum, J., dissenting) ("Counter-textual statutory interpretations, like kudzu, often creep unpredictably."), *rev'd*, *Lackey v. Stinnie*, 145 S. Ct. 659 (2025). Nowadays, *McDonnell Douglas* "has become the presumptive means of resolving Title VII cases at summary judgment." *Tynes*, 88 F.4th at 952 (Newsom, J., concurring). The Fourth Circuit regularly applies *McDonnell Douglas* at summary judgment and has done so for decades. *See, e.g.*, *Jamil v. Sec'y, Dep't of Def.*, 910 F.2d 1203, 1206–08 (4th Cir. 1990); *Mitchell v. Data*

---

[3] One might ask if the original purpose comports with the text of Title VII or otherwise makes sense. While I doubt it, I'll leave that issue alone because there is enough to discuss with *McDonnell Douglas*' use at summary judgment.

*Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993) (stating in age discrimination case that "[a]lthough the proof scheme is staged with shifting burdens, such discrimination cases may nevertheless be evaluated under established summary judgment principles"); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–61 (4th Cir. 1996); *Lettieri v. Equant Inc.*, 478 F.3d 640, 646–49 (4th Cir. 2007); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217–18 (4th Cir. 2016); *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254–55 (4th Cir. 2025). The upshot of our decisions is that a Title VII plaintiff has *only* two options at summary judgment: proceed with (1) direct evidence, or (2) *McDonnell Douglas*' burden-shifting framework for circumstantial evidence. *See Wannamaker-Amos*, 126 F.4th at 255.

The Supreme Court has not gone so far. It has never decided that *McDonnell Douglas* applies to a Title VII case at summary judgment. *See Hittle*, 145 S. Ct. at 761 n.2 (Thomas, J., dissenting). In one Title VII case at summary judgment, the Court concluded *McDonnell Douglas* did not apply because the plaintiff relied on direct, rather than circumstantial, evidence of discrimination. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). In the recent *Ames* case, addressing an additional prima facie requirement that lower courts applied to majority-group plaintiffs, the Court "assume[d] without deciding that the *McDonnell Douglas* framework applies at the summary-judgment stage of litigation."[4] 145 S. Ct. at 1545 n.2.

---

[4] While the Court has applied *McDonnell Douglas* to non-Title VII claims at summary judgment, it has not addressed the framework's (in)consistency with Rule 56. *See Tynes*, 88 F.4th at 952 n.2 (Newsom, J., concurring) (collecting cases).

36

Relatedly, it has never said *McDonnell Douglas* is the only way a plaintiff can establish a Title VII claim through circumstantial evidence. *See Hittle*, 145 S. Ct. at 762 (Thomas, J., dissenting) (stating that "satisfying *McDonnell Douglas* is not the only way or even the best way to prove a [Title VII] claim"); *but see Wannamaker-Amos*, 126 F.4th at 255 (implying, perhaps inadvertently, that (1) direct evidence and (2) *McDonnell Douglas* burden-shifting are the only two methods for proving Title VII discrimination). Nor has the Supreme Court said that direct and circumstantial evidence should be considered separately at summary judgment. *See Ames*, 145 S. Ct. at 1554–55 (Thomas, J., concurring).

While we have often applied *McDonnell Douglas* at summary judgment, at times we have cautioned that courts must "resist the temptation to become so entwined in the intricacies of the proof scheme that they forget that the scheme exists solely to facilitate determination of the 'ultimate question of discrimination *vel non*.'" *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (quoting *Aikens*, 460 U.S. at 714); *see also Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010) ("By the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination, and 'the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.'" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993))).

37

Unfortunately, many courts—including ours—have not heeded that caution. They continue to dive into the intricacies of the proof scheme at the expense of the text of Title VII and the summary judgment standard.[5]

### III. What's the Problem?

There are several problems with our use of *McDonnell Douglas*. First, it's counter-textual. Second, *McDonnell Douglas* is more restrictive than the language in the statute. Third, it imposes a higher burden than Federal Rule of Civil Procedure 56 requires at summary judgment. And fourth, it is unnecessarily complex. I address these problems below.

### A. *McDonnell Douglas* is Judicially Manufactured

Even as originally contrived, *McDonnell Douglas* does not appear in the text of Title VII. Recall that Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Simply put, the statute prohibits discriminatory employment practices.

---

[5] But not all. Some circuits recognize that to survive summary judgment, a plaintiff need only provide "circumstantial evidence that creates a triable issue on the employer's discriminatory intent." *Tynes*, 88 F.4th at 946 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)); *see also id.* at 946 n.2; *Ortiz*, 834 F.3d at 765.

But *McDonnell Douglas* is something else. Remember the framework. First, a plaintiff must make a prima facie case. *McDonnell Douglas*, 411 U.S. at 802. Second, if the plaintiff does that, she holds a presumption of discrimination. The employer must produce a non-discriminatory reason for the employment practice in order to rebut that presumption. *Id*. And third, if the employer does that, the plaintiff must show that the non-discriminatory reason was pretextual. *Id*. at 804.

Title VII doesn't mention prima facie case or pretext. It likewise says nothing about a burden-shifting framework. That alone is a problem. Under our Constitution, Congress—not judges—makes laws. While our job is to interpret those laws, inventing tests inconsistent with a statute's text, in effect, strays from our role and invades Congress'. Maybe judicially created tests cannot be avoided in the face of statutory text that provides no guidance. But that's not the case here. Why not stick with the language Congress passed? Title VII bans discrimination in the workplace on the basis of race, color, religion, sex or national origin. That's the standard we should apply.

### B. *McDonnell Douglas* is Narrower than Title VII

It's bad enough when courts make things up; it's worse when they do so in a way that limits what Congress wrote. In my view, that's what happened here. The elements of the *McDonnell Douglas* framework are under-inclusive compared to Title VII. Said differently, a plaintiff could get kicked out of court for flunking *McDonnell Douglas* even though she could establish, or at least create a genuine dispute of material fact about, discriminatory employment practices.

To explain, let's look at this case. Under *McDonnell Douglas*, to establish a prima facie case of failure-to-promote sex discrimination, Dr. Hollis must show (1) she is in a protected group; (2) she applied for promotion/tenure; (3) she was qualified; and (4) the university denied the promotion/tenure in favor of someone outside the protected class "under circumstances giving rise to an inference of unlawful discrimination." *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 928 F.2d 118, 121 (4th Cir. 1991). Focusing on prong three, what if Dr. Hollis was not qualified but Morgan State hired an equally unqualified white male? That would fail prong three but might still be discriminatory. Or imagine Dr. Hollis, as she claims here, was qualified. What if Morgan State refused to promote Dr. Hollis but didn't promote anyone? That would fail the prima facie case requirement at prong four, but it might also be discrimination on the basis of sex or race.

The pretext requirement can be under-inclusive, too. Title VII prohibits employer actions for which discrimination is a "motivating factor," even though the employer may have other motivating factors. 42 U.S.C. § 2000e-2(m). So, "a plaintiff may establish a Title VII violation by proving that an employer took an employment action *in part* because of an unlawful motive." *Ames*, 145 S. Ct. at 1554 (Thomas, J., concurring). *McDonnell Douglas* is narrower. Under the framework, once the employer produces legitimate, non-retaliatory reasons, the burden shifts back to the plaintiff to demonstrate the employer's "stated reason for [plaintiff's] rejection was in fact pretext." 411 U.S. at 804; *see also Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Under *McDonnell Douglas*, the plaintiff is confined to show the whole of the employer's stated reason for the rejection was pretext. *See Ames*, 145 S. Ct. at 1554 (Thomas, J., concurring). But that is

40

narrower than the statutory text. An employer might have two reasons for rejection, one valid and one discriminatory. *McDonnell Douglas* effectively buries that discriminatory reason. A plaintiff's claim should not fail just because she cannot show the employer's stated reasoning is pretextual—a plaintiff need only show "a reasonable inference of unlawful discrimination." *Id.*

These examples aren't intended to be exhaustive. But they illustrate how the judge-made *McDonnell Douglas* framework can narrow the scope of Title VII's relief.

### C. *McDonnell Douglas* Imposes a Higher Burden than Rule 56

*McDonnell Douglas* also obfuscates the summary judgment inquiry. It requires a plaintiff to establish a prima facie case, which may be "done by *showing*" four elements. 411 U.S. at 802 (emphasis added). Then, once an employer provides a legitimate, non-retaliatory reason, the plaintiff must "*show* that [employer's] stated reason for respondent's rejection was in fact pretext." *Id.* at 804 (emphasis added).

"Show" sounds a lot like "prove." But Federal Rule of Civil Procedure 56 simply requires a nonmovant—ordinarily the plaintiff in these employment discrimination disputes—to raise a genuine dispute of fact to survive summary judgment. There's no need for a plaintiff to show—i.e., prove—elements of the prima facie case. She need not show she "applied and was qualified for a job for which the employer was seeking applicants." *McDonnell Douglas*, 411 U.S. at 802. Nor must she show that the employer's "stated reason for [plaintiff's] rejection was in fact pretext." *Id.* at 804. Instead, a plaintiff will survive summary judgment if she raises a genuine dispute of material fact as to intentional discrimination. *Aikens*, 460 U.S. at 714; *see also Ames*, 145 S. Ct. at 1553 (Thomas, J.,

concurring) (explaining, as an example, that a "plaintiff need only present sufficient evidence to create a 'genuine dispute as to' whether the employer's stated reason was pretextual" (quoting Fed. R. Civ. P. 56(a))). Thus, *McDonnell Douglas* can create a higher burden to survive a summary judgment motion than Rule 56 imposes.

Of course, if *McDonnell Douglas* is used at summary judgment, courts should apply Rule 56's standard, as the majority ably does here. *See* Maj. Op. 19–24. Courts should only require a plaintiff to create a genuine dispute of material fact as to the *McDonnell Douglas* factors—not to prove them. Sometimes courts do that. *See, e.g.*, *Wannamaker-Amos*, 126 F.4th at 255–56 (recognizing plaintiff "put forward ample evidence to demonstrate a material issue of fact" as to a prima facie element). But not always. *See, e.g.*, *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (concluding, on review of a summary judgment grant, that plaintiff was "unable to prove her prima facie case because she has not identified any similarly situated employees who were treated more favorably" (internal quotation omitted)).

Of course, one might respond that we do not need to abandon a longstanding principle just because courts sometimes err in applying it. But why insist on a rule that makes such errors more likely? *McDonnell Douglas* potentially conflicts with Rule 56. And when it does, Title VII plaintiffs wind up with the short end of the stick.[6]

---

[6] In this case, straying from the text has helped defendants. At other times, it might help plaintiffs. Of course, the point of sticking to the text is not to help one side or the other. It's to stay in our lane of interpreting and applying the law, rather than making it.

42

### D. *McDonnell Douglas* is Unnecessarily Complex

While the text of Title VII is straightforward, the *McDonnell Douglas* framework is not. It requires judges to manufacture prima facie elements for factual situations covered by Title VII but not addressed in *McDonnell Douglas*; it encourages courts to segregate direct evidence from circumstantial evidence instead of viewing the full record for a genuine dispute of material fact; and it unnecessarily requires trial judges to manage multiple moving parts as *McDonnell Douglas*' burden of production flips back and forth.

#### 1. *Variance in the Prima Facie Elements*

*McDonnell Douglas* initially laid out four elements for establishing a prima facie case of racial discrimination. *See* 411 U.S. at 802. A plaintiff could raise a prima facie case by showing (1) her racial minority status; (2) she applied and qualified for an open position; (3) the employer rejected her despite her qualifications; and (4) after the rejection, the position remained open. *See* 411 U.S. at 802. But these don't make sense in every case. Take this one, again. Dr. Hollis applied for *promotion*, rather than an open position. And the associate and full professor positions did not remain open, because there was no open position for another applicant to take. In other words, the elements laid out by *McDonnell Douglas* don't cover every conceivable employment discrimination scenario.

The Supreme Court acknowledged the elements of the prima facie proof requirement would vary from case to case. *See McDonnell Douglas*, 411 U.S. at 802 n.13. But what elements apply to which scenario has taken on a life of its own. *See McNairn v. Sullivan*, 929 F.2d 974, 977 n.6 (4th Cir. 1991) (declining to apply the prima facie elements set forth in *Wright v. Nat'l Archives & Records Serv.*, 609 F.2d 702, 714 (4th Cir. 1979)

43

because *Wright* involved a position open to a *limited* number of applicants, whereas *McNairn* involves a position open to *all* applicants); *see also* J.A. 170–71 (district court applying modified prima facie elements adapted for college tenure hiring in *Alvarado*, 928 F.2d at 121). In other words, the judge-made *McDonnell Douglas* framework begets more judge-made variations of it.

Instead of debating which box-checking elements should apply to an infinite array of Title VII factual scenarios, we should simply follow the text of the statute—has the plaintiff raised a genuine dispute of material fact as to intentional discrimination?

### 2. *Separating Direct Evidence from Circumstantial Evidence*

The Supreme Court long ago concluded that *McDonnell Douglas*' burden-shifting framework does not apply to cases in which a plaintiff presents direct evidence of discrimination. *See Trans World Airlines*, 469 U.S. at 121. It only applies to cases in which a plaintiff presents circumstantial evidence. *See Ames*, 145 S. Ct. at 1554 (Thomas, J., concurring). As a result, at the outset of litigation, courts must parse the fine line between evidence that is direct or circumstantial. *See Wells*, 325 F.3d at 1225 (Hartz, J., writing separately) (explaining "courts must engage in the singularly unproductive exercise of deciding whether some item of evidence is 'direct evidence' in order to decide how to go about analyzing whether the plaintiff's claim survives"). But "[a]s in any lawsuit, the plaintiff may prove his [Title VII] case by direct or circumstantial evidence." *Aikens*, 460 U.S. at 714 n.3; *see also Ames*, 145 S. Ct. at 1554 (Thomas, J., concurring) (noting a combination of direct and circumstantial evidence is sufficient in ordinary civil litigation).

44

Perhaps encouraged by *Trans World Airlines*' dichotomy between direct and circumstantial evidence, many courts erroneously put direct and circumstantial evidence into distinct boxes when evaluating an employer's motion for summary judgment. Here, for example, the district court found Steven LeBoon's affidavit about Dr. Prime's discriminatory comments to be insufficient direct evidence to survive summary judgment. *See* J.A. 178–79. It concluded the conversation was too remote because it occurred two years prior to Dr. Hollis' promotion application, and because Dr. Prime was not the sole or final decisionmaker for Dr. Hollis' application. But then, during its consideration of *McDonnell Douglas* burden shifting, the court never mentioned LeBoon's affidavit. The district court did not consider that affidavit as to Dr. Hollis' failure-to-promote, retaliation or wage-discrimination claims. By separating Dr. Hollis' evidence into a direct evidence box and a circumstantial evidence box, the district court failed to properly assess the entire record for a genuine dispute of material fact. *See* Maj. Op. at 19–20; *see also Ortiz*, 834 F.3d at 766 ("[A]ll evidence belongs in a single pile and must be evaluated as a whole.").

Why separate direct and circumstantial evidence? We don't do that in other areas of the law. Instead, we look at all the evidence—direct and circumstantial—to see if it creates a genuine dispute of material fact when viewed in the light most favorable to the non-movant. I don't see why we should abandon that approach for Title VII claims.

### 3.  *Multiple Moving Parts*

Finally, we should step back and recognize the complexity of *McDonnell Douglas*' burden-shifting framework in its totality. I need not spell it out again, but the framework first requires trial courts to assess whether a plaintiff is proceeding with direct evidence,

45

circumstantial evidence or both. Sometimes that's easy, but not always. Then, if there is circumstantial evidence involved, the court must identify the proper elements of a prima facie case. Then, the court must assess whether the plaintiff has checked all boxes of that test. If so, the burden shifts to the employer to provide a non-discriminatory reason. Finally, the burden shifts back to the plaintiff to establish the ultimate question of discrimination. This is unnecessarily complex.[7] It contains more moving parts than Jim Furyk's golf swing.[8] Sure, a diligent trial court can wade through the morass and apply *McDonnell Douglas*' steps and sub-steps consistent with the Federal Rules of Civil Procedure. But why make it so complicated? The text of Title VII allows for a straightforward claim. In contrast, *McDonnell Douglas*' complexity increases the risk of error.

---

[7] Most circuits—including ours—have recognized the framework's complexity by barring it from jury instructions. *See Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1137 (4th Cir. 1988) (the *McDonnell Douglas* burden shifts "are beyond the function and expertise of the jury, which need never hear the term *prima facie* case" (cleaned up)); *see also* Tymkovich, *supra* note 2, at 527–28 & nn.189–91 (collecting cases). In other words, juries are instructed only on the ultimate question of discrimination. Why is the summary judgment standard any different?

[8] I hesitate a bit with this analogy. Furyk has won 17 PGA tour events and is a United States Open champion and Ryder Cup hero. *See Jim Furyk named vice captain for U.S. Ryder Cup for 4th time*, ESPN (Jan. 29, 2025, at 11:55 ET), https://www.espn.com/golf/story/_/id/43612019/jim-furyk-named-vice-captain-us-ryder-cup-4th [https://perma.cc/L2CJ-Z936]; Justin Doyle, *Jim Furyk*, BRITANNICA, https://www.britannica.com/biography/Jim-Furyk [https://perma.cc/3F3K-B3XQ] (last visited August 15, 2025). Furyk was the first PGA golfer to shoot 58 in a tour event. *See* Doyle, *supra.* And he will almost certainly be in the World Golf Hall of Fame. Furyk doesn't deserve flak from a hack golfer like me. But I suspect even he would concede his swing is unorthodox, and its moving parts increase the risk of error for an average golfer. The fact that Furyk achieved so much with such an unusual swing is a testament to his athleticism and hard work.

## IV.  What Should We Do About It?

In this case, I join in the majority's decision to vacate the district court's order. But I wish our court's precedent didn't preclude us from going further. In my view, *McDonnell Douglas* should be scrapped, or at least revisited. It has no textual basis. The prima facie case requirement is almost always irrelevant at summary judgment, and it's more restrictive than Title VII itself. The pretext requirement is also more restrictive than the statute. In addition, the *McDonnell Douglas* framework is inconsistent with Rule 56's standard, and yet courts, including ours, apply the framework at summary judgment all the time. Finally, applying *McDonnell Douglas* is unnecessarily complex—it demands continual judicial creation of prima facie elements to address new Title VII factual situations, creates an artificial distinction between direct and circumstantial evidence that applies to no other civil litigation and requires a trial court to proceed through many more moving parts than necessary. For those reasons, I join many other judges and Justices in calling for the clarification, or overturning, of *McDonnell Douglas*' burden-shifting framework. Congress gave us enough guidance with the text of Title VII. We do not need to muck it up with our own test.